**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JUDITH D. BEALL,
Plaintiff-Appellant,

v.

No. 96-2752

ABBOTT LABORATORIES; MICHAEL
MAIOCCO; MICHAEL BUDLONG,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
John R. Hargrove, Senior District Judge.
(CA-95-3827-HAR)

Argued: October 3, 1997

Decided: December 2, 1997

Before MURNAGHAN and WILKINS, Circuit Judges, and
MAGILL, Senior Circuit Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Magill wrote the opin-
ion, in which Judge Murnaghan and Judge Wilkins joined.

_____

**COUNSEL**

**ARGUED:** Vicki Greene Golden, CASHDAN & GOLDEN, Wash-
ington, D.C., for Appellant. Paul Farrell Strain, VENABLE, BAET-
JER & HOWARD, L.L.P., Baltimore, Maryland, for Appellees. **ON
BRIEF:** Michael G. Kane, CASHDAN & GOLDEN, Washington,

D.C., for Appellant. Terri L. Turner, VENABLE, BAETJER &
HOWARD, L.L.P., Baltimore, Maryland, for Appellees.

_____

**OPINION**

MAGILL, Senior Circuit Judge:

Judith Beall appeals the district court's grant of summary judgment
to defendants Abbott Laboratories (Abbott), Michael Budlong, and
Michael Maiocco on Beall's claims of retaliation and sexual harass-
ment under Title VII of the Civil Rights Act of 1964, 42 U.S.C.
§§ 2000e to 2000e-17 (1994), and the grant of summary judgment to
defendants Budlong and Maiocco on her claim of malicious interfer-
ence with business relations. We affirm.

I.

In 1985, Judith Beall began working as a territory manager (TM)
for Ross Laboratories (Ross), a division of Abbott that manufactures
and markets Similac infant formula and other pediatric nutritional
products. TMs sell Ross's products in hospitals and doctors' offices.
Beall worked in northern Virginia and was supervised by Michael
Budlong, the manager of the Virginia district. District managers are
responsible for helping TMs increase Ross's market share, which is
calculated by the "Mothers' Survey," a monthly questionnaire mailed
to 63,000 new parents to determine the dietary habits of infants during
the first six months of life. Approximately once per month, the district
manager accompanies each TM on a field visit and coaches the TM
on sales techniques. An evaluation of the TM's performance follows
each visit.

According to Budlong, Beall was difficult to manage at times, par-
ticularly because she did not respond well to criticism. However,
Budlong and Beall worked together without incident until shortly
after Beall returned from maternity leave to deliver her second child
in early 1993. During an April 1993 field visit to a local hospital,
Beall excused herself to go to the lactation room and use her breast
pump. Budlong then allegedly remarked that "he would come into the

2

room with [Beall] and do some paperwork while[Beall] pumped."
J.A. at 178 (Beall Aff.). While driving together the next day, Beall
told Budlong that she wanted to stop at the Fairfax Hospital lactation
room to use the breast pump. According to Beall, Budlong replied, "`I
don't want to stop now, pull your car off the road, get in the back seat
of your car and get out your breast pump.'" J.A. at 75 (Beall Dep.).
Although she recognizes that "the nature of [her] business is to dis-
cuss breast feeding," Beall was upset by these comments. J.A. at 57
(Beall Dep.).

One year later, in April 1994, Budlong required Beall and another
female TM to assemble their own promotional materials. All other
male and female TMs in the Virginia district either received assem-
bled materials or were permitted to arrange for their assembly. When
Beall complained, Budlong told her that "`the girls could put their
own [promotional] boxes together.'" J.A. at 57 (Beall Dep.). Beall
"didn't like to be referred to as `the girls.'" Id.

In a July 1994 field visit to a doctor's office, Beall took offense to
a comment Budlong made about Beall's weight loss. Beall claims that
Budlong said, "`[G]et over here and get on this scale, I want to see
how much you weigh.'" J.A. at 106 (Beall Dep.). According to
Budlong, however, Beall had lost a significant amount of weight and
often discussed her weight loss and related medical problems with
Budlong.

In November 1994, Budlong allegedly yelled at Beall to move her
car after Beall suffered a diabetes-related dizzy spell. Beall also
alleges that Budlong "frequently spoke to me in a demeaning and con-
descending tone and yelled at me during our monthly supervisory
work visits." J.A. at 178 (Beall Aff.).

Beall's performance declined during this time. Although generally
giving Beall "outstanding" or "commendable" performance ratings
throughout 1994, Budlong's evaluations made several references to
flaws in Beall's sales presentation and to Beall's inability to establish
effective Similac Welcome Addition Club (SWAC) programs. SWAC
programs provided expecting parents with educational literature and
coupons for Ross products. On August 25, 1994, Ross conducted a
detailed analysis of the Virginia district's sales data. This meeting

3

was attended by Budlong, regional manager Michael Maiocco, and two other Ross executives. The analysis revealed that Beall's Mothers' Survey trends had declined over the past four quarters and that Beall's market share ranked last among the forty-three TMs in the region. Beall also had poor SWAC enrollment numbers. During the August 30, 1994 field visit, Budlong informed Beall of the problems in Beall's performance. According to Beall, this was the most upsetting work visit she ever had.

On September 12, 1994, Beall wrote a letter to Maiocco alleging that Budlong had "created a hostile and intimidating work environment" and "inaccurately and unfairly attack[ed] my performance." J.A. at 352. Three days later, Beall met with Maiocco and discussed both the alleged sexual harassment and her poor performance analysis. Maiocco investigated the harassment allegation by interviewing Budlong and five TMs in Budlong's district. On September 26, Maiocco again met with Beall and informed her that his investigation did not substantiate her harassment claim.

At the September 26 meeting, Maiocco gave Beall a letter formally placing her on Unsatisfactory Performance status (USP) for sixty days.[1] Ross's official objective in placing employees on USP is "to restore employees to a satisfactory level of performance." J.A. at 361 (Ross Management Policy Manual). The USP letter stated that Beall was being placed on USP because she had the lowest market share in the district for the second quarter of 1994, the lowest SWAC enrollment numbers in the district, and a flaw in her sales presentation. The letter also set forth goals which Beall needed to meet before returning to satisfactory performance. Beall was to (1) maintain a specific market share of infants discharged from Fairfax Hospital and add 300 newborns at other hospitals; (2) establish new promotional programs at eight pediatricians' offices and eight obstetricians' offices; (3) increase prenatal SWAC enrollment to meet the district average and add sixteen new SWAC programs in obstetricians' offices;

_____

[1] The exact timing of Ross's decision to place Beall on USP remains in dispute. Viewing this in the light most favorable to Beall, we assume that the decision to place her on USP was not made until after Maiocco received Beall's letter of September 12, 1994.

4

(4) utilize Ross's five-step sales presentation; and (5) be present in her territory every day from 8:30 a.m. to 5:00 p.m. J.A. at 353-54.

The defendants contend that, although Beall's district ranking improved to twenty-eighth out of forty-three TMs, Beall did not meet the goals of the September 26 letter. Specifically, the defendants determined that (1) Beall did not add 300 newborns; (2) she established new promotional programs at only one pediatrician's office and only seven obstetricians' offices; (3) she fell short of the SWAC enrollment goals by over 100 prenatal enrollees; and (4) she established only ten of the required sixteen new SWAC programs.[2] J.A. at 358. On December 16, 1994, Beall was placed on final probation, which gave Beall another sixty days to meet the same USP goals.

In January 1995, Beall took short-term disability leave because of complications from her third pregnancy. She stayed on disability leave throughout the remainder of her employment at Ross. Her territory had been covered by other TMs during her absence. In June 1995, Abbott decided to reduce its Ross sales force by eliminating twelve TM positions. According to Ross's policy, the territory of any TM who is on leave for more than six months is considered vacant and a new individual is hired to fill the opening. Beall's six-month period ended July 10, 1995. Rather than hiring a new TM, Ross eliminated or "collapsed" Beall's territory pursuant to its reduction in force on September 27, 1995. Beall's clients were assigned to other TMs.

Beall filed a complaint with the Equal Employment Opportunity

_____

[2] In a letter to Maiocco dated December 28, 1994, Beall disputed the defendants' conclusion that she had failed to meet the USP goals. The essence of Beall's contention was that the defendants did not measure her performance according to criteria Beall considered relevant. For example, Beall contended that Ross should simply assume that she added 300 newborns because she had distributed 1000 promotional boxes. J.A. at 431. Beall presented no evidence to support the accuracy of her assumption. Beall also asserted that, because she delivered promotional boxes to doctors' offices, she necessarily established the requisite number of promotional box programs. J.A. at 434. Beall presented no evidence that the defendants counted the number of promotional boxes delivered to determine the number of promotional programs established.

Commission (EEOC) on March 17, 1995. The EEOC declined to act on Beall's complaint, and in October 1995 Beall obtained a right-to-sue letter from the EEOC.

Beall sued Abbott, Budlong, and Maiocco for retaliation, claiming that the decisions to place her on USP and final probation and to eliminate her position were made in retaliation for her complaints to Maiocco and the EEOC regarding Budlong's alleged harassment. Beall also alleged sexual harassment based on a hostile work environment and claimed that Budlong and Maiocco maliciously interfered with her business relations with Ross. The district court granted summary judgment for the defendants on all claims.

While the district court held that Beall had established a prima facie case of retaliation, the district court concluded that the defendants rebutted the prima facie case by showing legitimate nondiscriminatory justifications for each action. Because Beall did not produce sufficient evidence to show that the defendants' nonretaliatory justifications were pretextual, the district court granted summary judgment against her. The district court also held that Beall's sexual harassment claim was time-barred and that Beall could not state a claim of malicious interference with business relations because she failed to show that Budlong and Maiocco acted from personal rather than professional motives.[3] Beall now appeals.

II.

We review the district court's grant of summary judgment de novo, viewing all facts and inferences in the light most favorable to Beall. Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "While courts must take special

_____

[3] The district court treated the incident concerning the promotional materials as a disparate treatment claim. Because Beall could not show that Budlong had a discriminatory motive in refusing to allow her to make arrangements to have the promotional boxes assembled, the district court held that Beall did not establish a prima facie disparate treatment case. Beall does not appeal the district court's ruling on this issue.

6

care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996).

Beall argues that her employer's decisions to place her on USP and final probation and to collapse her territory were made in retaliation for her complaining about the alleged harassment. **4** On appeal, Beall argues that there are genuine issues of material fact concerning whether the defendants' nonretaliatory reasons were merely pretextual. We disagree.

To state a prima facie case of retaliation, a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action. Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). Once this is shown, the burden is on the employer to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions. Id. The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by proving "`both that the reason was false, and that discrimination was the real reason' for the challenged conduct." Jiminez v. Mary Washington College, 57 F.3d 369, 377-78 (4th Cir.) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)), cert. denied, 116 S. Ct. 380 (1995). The plaintiff always has the ultimate burden of persuading the trier of fact that the defendant engaged in retaliatory conduct. See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

We assume, arguendo, that Beall stated a prima facie case of retaliation. However, we agree with the district court that the defendants rebutted Beall's prima facie case with legitimate nonretaliatory reasons for each of their adverse actions. The defendants first contend

_____

**4** The district court considered Beall's retaliation claim as comprised only of the defendants' decisions to place her on USP and to eliminate her territory. Although Beall raised the issue, the district court did not address whether the decision to place Beall on final probation was retaliatory as well.

7

that they placed Beall on USP because of Beall's decline in performance, as measured by the Mothers' Survey results and the SWAC enrollment numbers. The defendants further contend that they placed Beall on final probation because of Beall's failure to meet the USP objectives. Finally, the defendants contend that they eliminated Beall's position because of Ross's need to eliminate jobs and its policy of collapsing vacant territories. Because the defendants have articulated legitimate nonretaliatory reasons for their actions, any presumption raised by the plaintiff's prima facie case "drops from the case." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255 n.10 (1981).

Beall first argues that the decision to place her on USP was pretextual because her performance did not warrant placing her on USP. She does not contest the fact that her performance had declined over the past four quarters. She ranked last out of forty-three TMs in market share and last in SWAC enrollments. In her effort to demonstrate pretext, Beall points to other TMs with low market share ratings who were not placed on USP. However, as the USP letter stated, the USP decision was based on Beall's poor market share and her poor SWAC numbers and a flaw in her sales presentation. Beall has not presented evidence that other TMs who performed poorly in all three areas enjoyed treatment different from Beall's. It is axiomatic that an employer is free to set its own performance standards, provided such standards are not a "mask" for discrimination. Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1571 (7th Cir. 1989). While Beall assures us that her performance did not merit USP, "'[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." Evans, 80 F.3d at 960-61 (quoting Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980)). Accordingly, she has failed to show that the defendants' reasons for placing her on USP were mere pretext for retaliation.

Beall also has not shown that the defendants' reason for placing Beall on final probation was mere pretext. The letter of September 26, 1994, clearly set forth the requirements that Beall needed to meet in order to return to satisfactory performance. J.A. at 353-55. The defendants contend that she did not meet these goals. In response, Beall asserts that the defendants mistakenly assessed her performance during the USP period. She asserts that her delivery of promotional boxes

8

to doctors' offices should count as establishing a promotional program at each office. She relies on the number of promotional boxes she delivered as evidence of the total number of new infants using Ross products. Beall also asserts that the defendants did not count all of her SWAC enrollments, although she never alleges that she met the required percentage of prenatal enrollments. Beall has thus made it clear that, if she could, she would use different criteria to calculate her performance. However, absent evidence of retaliatory motive, we leave to the employer's discretion the method of evaluating an employee's job performance. See Jiminez, 57 F.3d at 383 ("The crucial issue in a Title VII action is an unlawfully discriminatory motive for a defendant's conduct, not the wisdom or folly of its business judgment."). Accordingly, Beall has not demonstrated a genuine issue of material fact concerning the defendants' reason for placing her on final probation.

Finally, Beall cannot show that the decision to collapse her territory was retaliatory. Beall's position was eliminated pursuant to a reduction in force at Ross and according to Ross's vacant territory rules. Beall has not presented evidence to show that the need for a reduction in force was pretextual or that Ross applied its policy with a retaliatory motive. Indeed, Beall has simply not produced sufficient evidence for a reasonable trier of fact to conclude that the decision to eliminate her territory had any relation to Beall's complaint of harassment. Without evidence of pretext for retaliation, this Court will not act as a "super-personnel department that reexamines an entity's business decisions." Dale v. Chicago Tribune Co. , 797 F.2d 458, 464 (7th Cir. 1986). Beall has thus failed to show how any of the justifications for her employer's actions were mere pretext for retaliation against Beall. Accordingly, the defendants are entitled to summary judgment on Beall's retaliation claim.

III.

Beall claims she was subjected to sexual harassment due to a hostile work environment. To pursue this claim, Beall must have filed a complaint with the EEOC within 180 days of the incident, or within 300 days of the incident if state or local proceedings are initiated. 42 U.S.C. § 2000e-5(e)(1) (1994). Incidents outside of the statutory window are time-barred unless they can be related to a timely incident as

9

a "series of separate but related acts" amounting to a continuing violation. <u>Jenkins v. Home Ins. Co.</u>, 635 F.2d 310, 312 (4th Cir. 1980) (per curiam).

Beall's sexual harassment claim is time-barred. Beall filed her EEOC complaint on March 17, 1995. The only alleged incident that occurred during the 180 days[5] prior to March 17 is the November 1994 field visit in which Budlong yelled at Beall while she was driving. Although perhaps revealing Budlong to be "unpleasant and sometimes cruel," this incident clearly is insufficient to give rise to a claim of harassment. <u>Hartsell v. Duplex Prods., Inc.</u>, 123 F.3d 766, 772 (4th Cir. 1997). Title VII simply does not guarantee freedom from insensitive remarks that do not create an objectively abusive work environment. <u>See id.</u> at 772-73. Consequently, Beall cannot rely on time-barred events under the "continuing violation" theory because no timely violation has been alleged. <u>Woodard v. Lehman</u>, 717 F.2d 909, 915 (4th Cir. 1983) (continuing violation theory available "<u>only</u> where an actual violation has occurred within that requisite time period").

IV.

Beall's final claim is that Budlong and Maiocco maliciously interfered with Beall's employment relationship with Ross. To state a claim for tortious interference with a business relationship, the plaintiff must allege that "a third party, without justification and for an unlawful purpose, intentionally interfered with the business relationship between the plaintiff and another, causing the plaintiff actual damage." <u>Bleich v. Florence Crittenton Servs., Inc.</u>, 632 A.2d 463, 474-75 (Md. Ct. Spec. App. 1993). Employees acting within the scope of their employment cannot be liable for interfering with the relations between the employer and another. <u>Id.</u> Beall has failed to articulate evidence that either Budlong or Maiocco acted outside of the scope of their professional duties. We therefore find this claim to be without merit.

_____

**5** Because Beall did not initiate state proceedings, the 180-day window applies. <u>See</u> 42 U.S.C. § 2000e-5(e)(1).

10

V.

For the reasons stated above, we affirm the district court's grant of summary judgment in favor of the defendants.

AFFIRMED

11