**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SHEILA COHEN,
Plaintiff-Appellant,

v.

ABBOTT LABORATORIES, an Illinois
Corporation doing business in North
Carolina,
Defendant-Appellee.

No. 98-1565

SHEILA COHEN,
Plaintiff-Appellee,

v.

ABBOTT LABORATORIES, an Illinois
Corporation doing business in North
Carolina,
Defendant-Appellant.

No. 98-1628

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-96-943)

Argued: March 4, 1999

Decided: April 27, 1999

Before WIDENER, LUTTIG, and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Richard Woodson Rutherford, JOYCE L. DAVIS &
ASSOCIATES, Raleigh, North Carolina, for Appellant. Kerry Anne
Shad, SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL &
JERNIGAN, L.L.P., Raleigh, North Carolina, for Appellee. **ON
BRIEF:** Zoe G. Mahood, JOYCE L. DAVIS & ASSOCIATES,
Raleigh, North Carolina, for Appellant. Mark A. Ash, SMITH,
ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN,
L.L.P., Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellee Abbott Laboratories fired appellant Sheila Cohen in June
1995, after a series of incidents for which Cohen was disciplined.
Cohen sued Abbott, under both state and federal law, alleging sex dis-
crimination and retaliation for reporting sexual harassment. The dis-
trict court dismissed one claim on the pleadings and the remaining
claims on summary judgment. Finding no genuine issue of material
fact on any claim, we affirm.

I.

Prior to her discharge, Cohen had worked at Abbott since 1981 in
its saline solution bottling operation in Rocky Mount, North Carolina.
The events that give rise to this dispute chiefly occurred from Febru-
ary to June, 1995.

In February 1995, Cohen had a rift with co-worker Robbie Griffin,
after she reported to her supervisor that Griffin had failed to respond
to an ozone alarm. Angry at Cohen for getting him in trouble, Griffin

2

thereafter, according to Cohen, repeatedly caused her problems in the performance of her work. In the evening of March 24, 1995, Cohen reported the then-latest incident to Steve Freeman, her production manager. (Freeman had been promoted to this position in 1988 when Abbott asked his predecessor, Bobby Moody, to resign after reports that Moody had sexually harassed Cohen and others. Freeman is married to the sister of Moody's wife.) Cohen and Freeman agreed that, from that time forward, in order to avoid friction, Cohen would report any mechanical problems to Brenda Phillips, the manufacturing supervisor, rather than to Griffin. Both Freeman and Phillips testified that, at the meeting with Cohen the evening in which they established this new procedure, they also made clear that Cohen was not to talk to anyone about her problems with Griffin. Cohen disputed their characterization of this conversation, but admitted that Freeman told her, "`[w]ell, then, there is no need to discuss this with anybody why instrumentation problems are being handled through Brenda [rather] than through you.'"

Notwithstanding this warning, Cohen discussed the tension with Griffin with several of her co-workers in the Abbott cafeteria the very next morning (March 25). Her criticism of Griffin provoked several of his co-workers to defend him, which led to further ill-tempered remarks by Cohen against men in general and the men at Abbott in particular. Two of those present immediately complained to their supervisor, who had also been present, and the supervisor informed Freeman of Cohen's outburst.

As a consequence of this outburst, later in the early morning of March 25 Cohen received a second instruction to be silent about Griffin, this one unambiguous. Brenda Phillips approached Cohen, told her of the complaints about her outburst, and, in Cohen's words, "told me . . . not to be talking about Robbie anymore."

Again, however, Cohen immediately discussed the matter later that same morning with a co-worker. Phillips observed this conversation, reported it to Freeman, and recommended a written reprimand. Phillips reported her recommendation to Jack Layman, of Human Resources, and he instead decided on a written warning, a more severe discipline.

3

Layman's decision resulted in a written warning to Cohen for "Defamation of Character," which included yet a third order not to further discuss the problems she was having with Griffin. Phillips drafted this warning, and she and Freeman presented it to Cohen in late May, after Cohen returned from a seven-week absence due to an ankle injury. The warning referred to the events discussed above, including the meeting on the evening of March 24 at which Cohen, according to the warning, "agreed on the plan of action . . . eliminating the need for any further discussion of the [Griffin] matter with other employees." It also cited Cohen's "past history of conflict and disruptive behavior" as justification for the warning. It ordered her not to "hold discussions slandering" anyone or to "disrupt the work place," and "not to confront other employees regarding issues discussed in this warning." Said the warning, "[y]ou are to bring your concerns to your supervisor." Finally, the written warning informed Cohen that future violations would result "in further disciplinary action up to and including termination." Cohen admits to having read and understood this written warning.

Disregarding her instructions, Cohen immediately discussed the written warning with two fellow employees and lamented to Abbott's occupational health nurse that Freeman disliked her. After learning of this latest violation, Freeman recommended another written warning. Layman, however, overruled Freeman and, given Cohen's pattern of conduct, decided on termination. Cohen was fired in June. Phillips informed Cohen of Layman's decision.

In November 1995, Cohen filed charges of "Retaliation for sex harassment complaint" and of "sex discrimination" with the Equal Employment Opportunity Commission ("EEOC"). Cohen initially cooperated extensively with the EEOC, meeting with an official in February 1996, twice providing documentation, and responding to the EEOC's effort to amend her complaint, which the EEOC considered incomplete. Cohen's patience ran out, however, when the EEOC sent her a second round of proposed changes, and she refused to cooperate further. The EEOC thereafter dismissed Cohen's charges "for failure to cooperate," and issued her a notice of right-to-sue. The letter apprising her of the dismissal, in July 1996, informed Cohen that "[y]ou . . . can proceed in Federal court on your own."

4

Cohen did proceed on her own, bringing suit in federal court in November 1996. The complaint appears to state four separate claims: (1) retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); (2) sex discrimination under Title VII, 42 U.S.C. § 2000e-2(a); (3) retaliatory discharge in violation of North Carolina public policy; and (4) discharge on account of sex, in violation of North Carolina public policy. Although Freeman did not make the ultimate decision to fire Cohen, the complaint names only Freeman as having had any desire to retaliate against her. [1] (Cohen now argues, however, that Layman assisted Freeman's efforts.) Cohen alleges that Freeman's motive was revenge for Cohen's participation in the investigation of Moody seven years before.

After extensive discovery, the district court entered judgment for Abbott on all of Cohen's claims. The court granted summary judgment on Cohen's two federal claims because, by failing to cooperate fully with the EEOC, she had failed to exhaust her administrative remedies. It granted judgment on the pleadings regarding her state law claim of retaliatory discharge because, in its view, there was in North Carolina "no stated . . . public policy against retaliatory discharge arising from complaints of sexual harassment," and thus no implied cause of action such as Cohen's. Finally, the district court appears to have entered summary judgment on Cohen's state law claim of sex discrimination; although it gave no reasons for so doing, the parties agree that the court dismissed this claim, and the court did enter an order of final judgment. Cohen now appeals on all of her claims.

II.

We first address Cohen's Title VII claims, and we conclude that they cannot survive summary judgment on the merits. As will be explained, her state claims likewise fail, for the same reasons as the Title VII claims.

_____

[1] Notwithstanding the suggestion in her complaint, she no longer argues that Abbott should be liable for Moody's harassment of her in 1988, but rather that Abbott's disciplining of Moody led to Freeman's (and ultimately Abbott's) actions against her in 1995. See Appellant's Br. at 14.

The district court held, and appellee Abbott argues on appeal, that Cohen may not sue under Title VII because, by ceasing her cooperation with the EEOC, she failed to exhaust administrative remedies as Title VII requires. See generally 42 U.S.C.§ 2000e-5(b); Davis v. North Carolina Dep't of Correction, 48 F.3d 134, 137-38 (4th Cir. 1995). Cohen responds that she did all that was required: she filed charges with the EEOC, then received a notice of right-to-sue. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974); Davis, 48 F.3d at 138. More importantly, Cohen argues that she did cooperate in good faith with the EEOC as much as could reasonably be required, ceasing to do so only when such became futile. She should not, she argues, suffer for the EEOC's obstinacy and delay. We see no reason to resolve this dispute, however. Since the parties have fully briefed the underlying merits, and since Cohen's Title VII claims plainly warrant summary judgment on their merits, we affirm on that ground, under our well established authority to "affirm on any legal ground supported by the record." Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993).

Cohen's Title VII claim of retaliation fails because, by the overwhelming evidence, including her own admissions, she has not rebutted Abbott's legitimate, nonretaliatory, reason for disciplining and then firing her. To survive summary judgment on a claim of retaliation, a plaintiff must first establish a prima facie case by proffering evidence that could convince a reasonable jury (1) that plaintiff engaged in a protected activity, (2) that the employer took an adverse employment action against plaintiff, and (3) that there is a causal connection between (1) and (2). Beall v. Abbott Lab., 130 F.3d 614, 619 (4th Cir. 1997). If the plaintiff does so, a presumption of retaliation arises, and the burden of production shifts to the employer to rebut the presumption by articulating a legitimate, nonretaliatory, reason for its adverse action. Id. If the employer meets this burden, the prima facie presumption drops out, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993), and the burden returns to the plaintiff to offer evidence of pretext sufficient to create a genuine issue of material fact -- that is, evidence that the employer's reason is false and that retaliation was the real reason for its adverse action. Beall , 130 F.3d at 619. The burden of persuasion remains always on the plaintiff. Id.

6

Even assuming that Cohen has established a prima facie case, she has failed to rebut Abbott's evidence that it first warned and then fired her for the plainly legitimate, nonretaliatory, reason of her continued insubordination in 1995, particularly when one considers this reason in light of Cohen's pattern of disruptive behavior. [2] See Armstrong v. Index Journal Co., 647 F.2d 441, 448 (4th Cir. 1981) ("[Title VII's bar on retaliation] was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work. . . . An employer must retain the power to discipline and discharge disobedient employees.").

An abundance of evidence supports Abbott's stated reason for firing Cohen. Three times Cohen violated instructions not to discuss with co-workers her conflicts with Griffin, and every time her violation almost immediately followed her receipt of the instruction. Even if a reasonable factfinder could accept Cohen's characterization of the first such instruction (on March 24), notwithstanding Phillips' testimony, Freeman's affidavit, Cohen's own quotation of Freeman's words, and the language of the contemporaneous written warning recounting the March 24 meeting, Cohen still violated two explicit instructions that she not discuss the problems she was having with Griffin. Those instructions, it bears recalling, came about not from unilateral action by Abbott's management but rather in response to the effort of Freeman and Phillips to respond to Cohen's complaints against Griffin. In addition, the final instruction, in the form of the written warning, explicitly informed Cohen of the risk of discharge for further disobedience. Thus, Cohen's fate was in her own hands when she knowingly continued to disobey her employer's orders.

Cohen's actions in 1995 were consistent with a long pattern of disruptive behavior, as shown by her annual performance review in

---

[2] There was no "adverse action" prior to 1995. Cohen admitted in her deposition that she suffered no loss of pay, status, or "any other kind of benefit" prior to May 1995 and instead was promoted and given raises, and received favorable performance reviews. In addition, the various slights that Cohen alleges she suffered from Freeman over a seven-year period, such as yelling and urging of other employees to spy on her, do not constitute adverse action. See Munday v. Waste Management of North Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997), cert. denied, 118 S. Ct. 1053 (1998).

7

1993, a warning for "disruptive conduct" in 1991 from her supervisors (not from Freeman), and copious notes from counselors (both female) in Abbott's Employee Assistance Program, which Cohen frequented from 1989 to 1993, repeatedly mentioning her "paranoia" about management (including, but hardly limited to, Freeman) and her conflicts with numerous co-workers, both male and female, over the slightest matters. This is the pattern to which the written warning referred and which Layman considered in making his decision to terminate Cohen rather than issue a second written warning.

Cohen does not dispute the series of events in 1995 or her pattern of disputes with co-workers; rather, she freely admits to almost all of it. And she has offered no evidence to convince a reasonable jury that Abbott's stated, and obvious, reason for terminating her is a pretext. She repeatedly, and almost exclusively, invokes Freeman's alleged animus from the Moody incident seven years before. Indeed, in her deposition, she stated her belief that, but for that incident, she would not have been fired in 1995. Such a complaint from seven years prior to the adverse action cannot even support a prima facie case of causation, see Causey v. Balog, 162 F.3d 795, 830 (4th Cir. 1998), much less rebut overwhelming evidence of a nonretaliatory reason for the adverse action. Neither does the mere knowledge of Freeman and others that Cohen had complained about sexual harassment in 1988, and thereafter, suffice to overcome such evidence, even if the adverse action had occurred in 1988. See Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Further, Cohen's argument for pretext based on Freeman's alleged animosity toward her overlooks several key facts. Not only did Freeman recommend against her termination in June 1995 (instead suggesting another written warning), but he also benefitted from Moody's dismissal in 1988, by receiving a promotion (making it doubtful that he had much, if any, motive to retaliate against her), and he assisted her in toning down the language in her 1993 performance review (written by her supervisor) criticizing her for disruptive behavior. More importantly, Cohen admits that she received a promotion a month after complaining about Moody and was never demoted; that her pay was never reduced but rather was increased over 50% from 1988 to 1995; and that on every annual performance review during that time, which Freeman had to approve, she was rated "very good,"

8

the second highest rating. When asked at her deposition whether Freeman ever caused her to lose pay, status, or "any other kind of benefit" prior to 1995, she answered, "[n]o."

Finally, it is to be recalled that Freeman did not act alone in 1995, but rather in coordination with both Layman and Brenda Phillips (neither of whom had any reason to care about the Moody incident from seven years before), and that Layman, not Freeman, made the final decisions both to issue a written warning and to fire Cohen. Although Cohen points to "close coordination between Layman and Freeman during the immediate pre-discharge period," it is hardly surprising, and in fact to be expected, that Cohen's manager would be communicating with the Manager of Employee Services in an effort to resolve a personnel problem. Nor can Cohen's mere assertion that Abbott retaliated for her generalized complaints in 1995 about the difficulties women faced at Abbott create a genuine issue of material fact, given the overwhelming evidence of Cohen's repeated insubordination in 1995 and pattern of disruptive behavior, and the weakness of her argument that Freeman (the most likely suspect for any desire to retaliate) was out to get her. Accordingly, Cohen's Title VII claim of retaliation must fail as a matter of law.

Cohen's Title VII claim of sex discrimination fails for similar reasons. She alleges that, because of her sex, the discipline she received -- the written warning and discharge -- was more severe than normal.[3] To establish a prima facie case of discriminatory discipline, a "plaintiff must show: (1) that he is a member of the class protected by Title VII; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees."

_____

[3] Cohen's complaint does not specifically allege that Freeman, between 1989 and 1995, created a hostile environment amounting to sexual harassment, but to the extent that one could so read it, we hold that the intermittent actions and comments that she alleges occurred over a seven year period did not, even if true, create a hostile environment because of her sex (or, for that matter, because of her reporting of harassment in 1988). See Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996).

Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993). If the plaintiff makes this showing, the burden of production then, as in a retaliation case, shifts to the employer to articulate a non-discriminatory reason for its different treatment of plaintiff. If the employer succeeds in doing so, the burden then shifts back to the employee to show pretext. Id.

Plaintiff has utterly failed to satisfy these requirements. She cannot establish a prima facie case, because she has not presented any evidence of a similarly situated male whose misconduct was comparable to hers, yet who received less severe discipline. Indeed, she did not even allege as much in her complaint, and admitted her lack of evidence in this regard in both her deposition and her response to interrogatories. Even if Cohen could establish a prima facie case, she has failed, for the reasons discussed above regarding retaliation, to show that Abbott's articulated reason for its actions was a pretext. Thus, for her claim of sex discrimination under Title VII, like her claim of retaliation, she has failed to present evidence sufficient to withstand summary judgment.

The same is true for Cohen's two claims under North Carolina law, which essentially parallel her Title VII claims. The parties disagree over whether North Carolina has an implied cause of action for discharge in retaliation for reporting sexual harassment; the district court held that it does not. We view this as an open question, and do not believe it necessary to resolve that question today. Instead, we may assume that such a cause of action exists, because Cohen still cannot prevail on her two state law claims. North Carolina, in addressing claims of discrimination, "has adopted the evidentiary standards and principles developed under Title VII." Brewer v. Cabarrus Plastics, Inc., 504 S.E.2d 580, 584 (N.C. App. 1998). [4] For the reasons dis-

_____

[4] We realize that in Brewer, which was decided after the district court's decision in this case, the court vacated a trial court's directed verdict for the employer in a suit that included a claim that the employer violated North Carolina public policy by dismissing plaintiff in retaliation for reporting racial discrimination. This ruling perhaps suggests that such a claim (and, by analogy, Cohen's retaliation claim) exists in North Carolina. The appeal in Brewer, however, turned entirely on the sufficiency of plaintiff's evidence; the court never discussed whether such a claim exists in North Carolina; and there is no evidence that the employer ever raised the issue. Under these circumstances, we decline to assume that the state has endorsed the new cause of action for which Cohen argues.

10

cussed above, we find no genuine issue of material fact in either of Cohen's state law claims and thus affirm the summary judgment on her sex discrimination claim and grant summary judgment to Abbott on her retaliation claim.

III.

The judgment of the district court is affirmed. **5**

AFFIRMED
_____
**5** Abbott's conditional cross-appeal is, accordingly, moot.

11