UNPUBLISHED

# UNITED STATES COURT OF APPEALS

### FOR THE FOURTH CIRCUIT

TERRI CLEARY,

*Plaintiff-Appellant,*

v.

NATIONWIDE MUTUAL INSURANCE COMPANY,

*Defendant-Appellee.*

No. 00-1461

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CA-98-918-19BD-3)

Argued: January 26, 2001

Decided: May 31, 2001

Before WILKINS, MOTZ, and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

### COUNSEL

**ARGUED:** J. Dennis Bolt, LAW OFFICES OF J. DENNIS BOLT, Columbia, South Carolina, for Appellant. Cara Yates Crotty, CONSTANGY, BROOKS & SMITH, L.L.C., Columbia, South Carolina, for Appellee. **ON BRIEF:** Henry S. Knight, Jr., CONSTANGY, BROOKS & SMITH, L.L.C., Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Terri Cleary appeals from the district court's order granting summary judgment in favor of her former employer, Nationwide Mutual Insurance Company, on her claim of retaliation under section 704 of Title VII, 42 U.S.C. § 2000e-3(a). Cleary asserts that Nationwide retaliated against her for making a sexual harassment charge to the company against her supervisor. We affirm the district court's decision.

### I.

### A.

### 1.

Cleary began working for Nationwide in December 1992 as the administrative assistant to Robert Herlong, a legislative affairs representative who was responsible for the company's lobbying functions in South Carolina and Georgia. Cleary and Herlong worked alone together in a two-person office in Columbia, South Carolina (the "Lobbying Office"), at some distance from Nationwide's Gateway office ("Gateway"), the company's state headquarters in northeast Columbia. During the course of this arrangement, Cleary alerted Nationwide that Herlong had been subjecting her to sexual harassment, including unwanted touching and explicit comments. Cleary reported this harassment in July 1996 to Marcia Blakewood, a human resource representative for Nationwide. While the ensuing investigation was underway, Herlong was permitted to continue working, while Cleary was placed on paid administrative leave.

At the conclusion of the investigation, on September 10, 1996, Nationwide contacted Cleary's attorney to report that at least some of

Cleary's allegations had been substantiated, and that Herlong's employment with the company was being terminated because of his behavior. Nationwide also informed Cleary's attorney that, in conjunction with Herlong's departure, the company planned to close the Lobbying Office and relocate that territory's legislative affairs representative to Atlanta, Georgia.

After Herlong's departure, Nationwide publicly maintained that he had left voluntarily, and the company internally advised its employees of the harassment investigation only on a "need-to-know" basis. In a statement disseminated on September 30, 1996, Nationwide announced that Herlong had resigned to "seek other opportunities" and that his position might be moved to Atlanta. Though this relocation plan was not officially approved until late 1996, the Lobbying Office had already been shut down, i.e., it was not restaffed following Herlong's departure, and its phones were disconnected. Moreover, Nationwide terminated Herlong's South Carolina lobbying registration that October. His replacement was not hired until March 16, 1997, when the position was filled in Atlanta.

Because of the closure of the Lobbying Office, Nationwide offered to transfer Cleary to a secretarial position in its claims division at Gateway. The parties agree that no administrative assistant positions were open in the Columbia area at that time. According to Nationwide, the company chose the available job for Cleary that most closely replicated her previous position. Dissatisfied with this offer, Cleary's attorney protested in a September 12, 1996 letter to Nationwide that "[i]t seems to me that [Cleary] is being punished as a result of making her complaint of sexual harassment." J.A. 255.[1] Nationwide, however, responded in a September 16, 1996 letter:

---

[1]The record indicates that Cleary perceived the change in office location and hours as "punishment" because, for example, she would now have a longer commute, and she would no longer be able to visit her child at a daycare center during her lunch break. Cleary also preferred lobbying work over claims work. As her attorney wrote in the September 12, 1996 letter to Nationwide: "The message she is receiving is: 'Okay, we have investigated your complaint, and because of you we have fired Mr. Herlong, and now you don't have the job and work schedule that you like.'" J.A. 256.

> At this time, having the legislative affairs office operate out of Atlanta seems the best manner. This step follows what we have done in other circumstances where a lobbyist position has been vacated.[2] While Nationwide understands and appreciates that [Cleary] would prefer to remain in the legislative affairs office, there is not any work for her there. The decision to close the office was not based upon the complaints of [Cleary]. Rather, it was based upon sound business reason. Should the decision change and we decide to maintain that office, [Cleary] could continue there.

J.A. 258. Nationwide also assured Cleary that her change of positions "has not affected [her] job title, job code, salary, benefits and opportunities for advancement." *Id.* at 259. Cleary notified Nationwide the following day that she was filing a complaint with the Equal Employment Opportunity Commission ("EEOC") based on elimination of her previous position. She also accepted the transfer to Gateway. There, Cleary was under the supervision of Vicki Betts, who had just one week's notice of the reassignment. Upon arrival, Cleary did not have a desk, chair, or computer, but she was soon able to obtain this equipment from the Lobbying Office.

2.

At Nationwide, positions are assigned pay bands, designated A through I, and salary ranges are specified within each pay band. Cleary's starting salary as an administrative assistant at Nationwide in 1992 was $23,500, and her position was classified as pay band C. At that time, the salary range for pay band C was $18,800 to $28,200.

Despite Nationwide's assurances to the contrary, sometime after Cleary transferred to Gateway in September 1996, she was inexplicably reclassified as a technical secretary and her pay band was downgraded from C to B. However, Cleary experienced no decrease in salary or benefits. Indeed, she received pay raises following her transfer from the Lobbying Office, in 1996 and 1998, albeit raises com-

---

[2]For example, upon the resignation of the company's legislative affairs representative in Nashville, Tennessee, that office had been moved to Raleigh, North Carolina.

prising a lower percentage of her total salary than two out of three of those she had received prior to reassignment.[3] By 1998, Cleary's salary of $30,200 was higher than the average for employees both in pay band B, at $26,880, and in pay band C, at $29,402. Though eligible for a lower maximum salary — $33,000 in pay band B as compared to $42,000 in pay band C — she had not yet reached this cap.

3.

In autumn 1996, Nationwide underwent a reorganization of Gateway and its nearby office in Lexington, South Carolina ("Lexington") that left Gateway with two technical secretaries and Lexington with none. Cleary was selected for transfer to Lexington, where she asserts that she was saddled with work formerly handled by two people.

On December 16, 1997, Cleary began a maternity leave that lasted nearly five months, through May 4, 1998. During this leave, she used six weeks and one day of paid sick leave, six weeks of paid maternity leave, three paid personal days, nine days of paid vacation earned in 1997, two weeks of unearned paid vacation advanced against her 1998 entitlement, and thirteen days of unpaid leave pursuant to the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654 ("FMLA").[4] Under company policy, Nationwide employees were entitled to up to five months' leave if it were mutually agreed to be "in the best interests of all concerned[,]" with factors such as "the company's ability to operate satisfactorily without [the employee's] efforts, and the length of the requested leave" taken into consideration. J.A. 228. Cleary requested, but was denied, additional leave through June 12, 1998. Upon return, Cleary was assigned again to Gateway, rather than

[3]While assigned to the Lobbying Office, Cleary received raises of 4.08% in 1993, 5.9% in 1994, and then 8.08% in 1995. Following the sexual harassment charge against Herlong, she received raises of 4.29% in 1996 and 3.42% in 1998. She did not receive any raise in 1997.

[4]Under the FMLA, certain employees are entitled to take up to twelve weeks of unpaid leave in any twelve-month period for qualifying medical or family reasons, including the birth of a child. *See* 29 U.S.C. § 2612(a)(1). An employee may be required to exhaust accrued sick, personal, and vacation time as part of the twelve-week leave. *See id.* § 2612(d)(2)(A).

Lexington, where, she asserts, she was continually monitored by Betts in an effort to gather evidence against her for this lawsuit.

A secretarial position later became available at Lexington, but, contrary to Nationwide policy, the opening was not advertised internally. Despite this, Cleary learned about the vacancy and asked to be reassigned to that office. The request was made to Betts. She, in turn, consulted Blakewood, the human resources representative who had handled the Herlong harassment investigation, about whether Cleary's request had to be granted. It was decided that Cleary need not be accommodated, and the position at Lexington was subsequently filled by someone else.

According to Cleary, during the period when discovery was underway in this matter, Betts was about to leave Nationwide and called a meeting with Cleary to tell her she had "done a great job[.]" J.A. 321. Cleary also asserts that Betts told her, "I know you probably think that I've been a real bitch to you and very mean to you, but I've received a lot of pressure from Nationwide." *Id.* Cleary later resigned from Nationwide, in a February 1, 1999 letter, citing "the constant intimidation and persecution that Nationwide has subjected me to[.]" J.A. 311.

## B.

Following issuance of a right to sue letter by the EEOC, and while still employed at Nationwide, Cleary filed this action on April 2, 1998, in the District of South Carolina, asserting her claim under Title VII for retaliation, 42 U.S.C. § 2000e-3(a).[5] The district court possessed jurisdiction over this case pursuant to 42 U.S.C. § 2000e-5(f).

---

[5]Though Cleary starkly asserted in her Complaint that "her employment status with [Nationwide] was unlawfully affected by her sexual identity[,]" J.A. 9, she failed to plead the elements of a sex discrimination claim under 42 U.S.C. § 2000e-2(a), and she apparently did not pursue such a cause of action below. Therefore, we address only the retaliation claim. While Cleary focuses on her theory that Nationwide retaliated against her for making a sexual harassment charge against Herlong, she also intermittently asserts that the company retaliated against her for filing the EEOC claim and this action.

This matter was automatically referred to a magistrate judge for all pretrial proceedings pursuant to 28 U.S.C. § 636(b)(1)(A)-(B) and District of South Carolina Local Rule 73.02(B)(2)(g). Following discovery, Nationwide moved for summary judgment. The magistrate judge, in his Report and Recommendation of February 7, 2000 ("Magistrate Report"), advocated the denial of summary judgment. Contrary to the magistrate's exhortation, the district court granted summary judgment in its Order of March 20, 2000 ("District Court Order"). We possess jurisdiction over this appeal of the District Court Order pursuant to 28 U.S.C. § 1291.

## II.

"We review an award of summary judgment de novo, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the nonmovant." *Riddick v. Sch. Bd.*, 238 F.3d 518, 522 (4th Cir. 2000) (citation omitted). "Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)).

## III.

## A.

Under section 704 of Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). In analyzing retaliation claims under Title VII, where there is no direct evidence of discrimination, we apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000). Initially, to establish a prima facie case, the employee must show that: "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Von Gunten v. Maryland*, 243 F.3d 858, 863 (4th Cir. 2001) (citing

*Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997)). Once the employee establishes a prima facie case of retaliation, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for the adverse action. *See Smith*, 202 F.3d at 248 (citing *Beall*, 130 F.3d at 619).

Finally, the burden shifts back to the employee to prove that the employer's purported reason for the action was mere pretext for retaliation. *See id.* The employee accomplishes this by showing "*'both* that the reason was false, *and* that discrimination was the real reason' for the challenged conduct." *Jiminez v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (emphasis in original). While it is "*permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation[,]" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2108 (2000) (emphasis in original), the claim of the employee "should not be submitted to a jury if there is evidence that precludes a finding of discrimination, that is if 'no rational factfinder could conclude that the action was discriminatory[,]'" *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000) (quoting *Reeves*, 120 S. Ct. at 2109).

B.

Cleary asserts that Nationwide took a series of retaliatory actions against her: (1) closing the Lobbying Office; (2) transferring her to Gateway; (3) changing her job title and pay band; (4) transferring her to Lexington; (5) denying her additional maternity leave; (6) constantly monitoring her upon her return to Gateway; and (7) denying her request to transfer back to Lexington. On the one hand, the magistrate judge determined that Cleary established a prima facie case of retaliation, and that she advanced sufficient evidence on which it could be concluded that Nationwide's proffered reasons for its actions were pretext for discrimination. On the other hand, the district court assumed, without deciding, that Cleary proved a prima facie case, but ruled that she failed to adduce evidence that Nationwide's explanations were pretextual.

Like the district court, we assume that Cleary established a prima

facie case of retaliation.[6] We address each of the adverse actions asserted by Cleary, and Nationwide's explanations for them, in turn.

### 1. *Closure of Lobbying Office*

Cleary contends that the Lobbying Office was shut down to conceal the fact of and circumstances surrounding Herlong's termination, and to simultaneously punish her for reporting the harassment. Nationwide depicts the closing of the office as a justifiable business decision. According to Nationwide, Alan Smith, the company's vice president of governmental affairs, had been advocating this closure since 1987, and Herlong's termination presented the opportunity to act on Smith's plan. Smith recommended moving the office to Atlanta for several reasons, including, inter alia, a desire to add Alabama to the legislative affairs representative's territory (South Carolina and Georgia) and, accordingly, locate the office in a central location among the three states; a need to account for the larger proportion of Nationwide business in Georgia and Alabama than in South Carolina; and a belief that "a new lobbyist, unfettered by longstanding South

---

[6]While it is undisputed that Cleary engaged in protected activity when she reported Herlong's harassment to Nationwide, it is questionable whether Cleary sufficiently established that the purported retaliatory actions taken against her were adverse and whether a causal connection existed between those employment actions and her protected activity. However, we need not decide these issues, because we conclude that Cleary failed to show that there is a genuine issue of material fact as to whether Nationwide's proffered reasons for its actions were mere pretext for retaliation.

Though we are following the district court's course in assuming, without deciding, that Cleary established a prima facie case of retaliation, we disagree with the court's statement regarding her burden of proof once Nationwide proffered legitimate reasons for its actions. According to the court, Cleary "bears the burden of producing at this stage evidence which would be sufficient to *convince* a reasonable juror that [Nationwide's] stated reasons for *all* of these actions are unworthy of belief and that [Nationwide] actually made the decisions in order to retaliate against her." District Court Order, at 6 (emphasis added). Cleary need only establish, for any one of the various adverse actions alleged, that a "rational factfinder could conclude that the action was discriminatory," *Reeves*, 120 S. Ct. at 2109.

Carolina connections, would fare better in cosmopolitan Atlanta." Appellee's Br., at 22.

Cleary, however, maintains that moving the Lobbying Office

> was done to protect Herlong, it was done to avoid any suspicion of sexual harassment by a high ranking Nationwide executive, and the effect was to radically and permanently alter [Cleary's] employment status with Nationwide. Nationwide decided to coddle Herlong, lie about his departure, and [Cleary] would have to pay the price for blowing the whistle.

Appellant's Br., at 14. Her first contention, that Nationwide relocated the office to conceal the harassment investigation and Herlong's termination, is supported, at least in part, by the record. In a December 3, 1996 interoffice memorandum outlining various reasons to relocate Herlong's former position to Atlanta, Smith wrote that "there are bad vibrations about Nationwide in South Carolina for lifting Bob off the case with no public explanation. We are perceived in some quarters as having picked on somebody who was part of the fraternity. Moving the job to a new location mitigates the speculation." J.A. 272. The problem for Cleary, however, is that any intention to hide Herlong's harassment of her does not equate to an intention to retaliate against her for reporting his abuse.

On the contrary, it might be relevant to Cleary's case if, as she also asserts, Nationwide closed the Lobbying Office with the intention of penalizing her. To prove this contention, Cleary attempts to discredit Nationwide's proffered business reasons for the closure with evidence that, while she was told that the office was closing in September 1996, the official decision to relocate it to Atlanta was not made until months later. This evidence, too, is unhelpful to Cleary because, despite the lack of official action on Smith's recommendation, the Lobbying Office was virtually abandoned upon Herlong's termination.

Finally, Cleary attempts to bolster her theory with evidence that she was placed on paid administrative leave during the investigation, while Herlong remained on the job, and that, following her transfer

to Gateway, she was initially allowed to continue helping with lobbying work until it was abruptly reassigned to someone else. Nationwide provides legitimate reasons for these occurrences. Cleary was placed on leave during the investigation — by mutual agreement with Nationwide — to separate her from her then-alleged harasser; in the meantime, Herlong necessarily continued working to prevent the Lobbying Office from ceasing to function. Moreover, following her transfer to Gateway, Cleary was asked to help with lobbying functions that were being handled on only an interim basis by existing Nationwide employees until the hiring of a new legislative affairs representative in Atlanta. Cleary was thanked for her assistance, but those duties were readily reassigned so that they would not interfere with her new position in claims. Cleary offers no evidence to refute these explanations.

In summary, there is nothing to suggest that Cleary was anything more than a coincidental victim of the decision to close the Lobbying Office. As the district court cogently explained:

> To be sure, the elimination of plaintiff's job occurred as a result — albeit indirect — of her complaint against Herlong. However, plaintiff has presented no evidence that the elimination occurred *because of* her complaint. This is not a mere semantical distinction. Instead it is a distinction on which liability under Title VII hinges.

District Court Order, at 4-5 (emphasis in original).

## 2. *Transfer to Gateway*

Nationwide attests that Cleary was transferred to Gateway as the best available option once the Lobbying Office closed. Although her arrival at Gateway was marked by some confusion — little notice of her impending arrival to her supervisor, lack of a computer, desk, and chair for Cleary to use — by all accounts, Cleary readily settled into her new position. Moreover, Cleary concedes that there were no administrative assistant positions open at the time of her reassignment. Further, there is no evidence that supervisor Betts knew of the harassment investigation until Cleary herself told Betts about it.

Although, according to Cleary, Betts made the statement to her that "I know you probably think that I've been a real bitch to you and very mean to you, but I've received a lot of pressure from Nationwide[,]" J.A. 321, Cleary offers no other evidence elaborating on this comment. That is, Cleary interprets the statement to mean that Nationwide pressured Betts to mistreat Cleary, without acknowledging that it could have many other meanings. There is no evidence of who within Nationwide applied the "pressure" or of its aim. Therefore, this ambiguous statement is insufficient evidence on which a reasonable factfinder could rely to find pretext for discrimination.

### 3. *Change in Job Title and Pay Band*

Nationwide concedes that it was unable to determine the circumstances surrounding the changes in Cleary's job title, from administrative assistant to technical secretary, and pay band, from C to B; however, the company believes that these changes were the result of "an administrative action taken by someone who was not aware of the assurances given to Cleary . . . done so that Cleary's personnel records would accurately reflect the position she was in fact occupying at the time." Appellee's Br., at 26. Cleary points to no evidence that anyone with knowledge of the harassment complaint was involved in the change. Indeed, despite these changes, Cleary experienced no decrease in salary or benefits, and, since she had not yet reached the salary cap in pay band B, she was not affected by the difference in ceilings between pay bands B and C.

Moreover, Cleary does not contend that her assignment to pay band B otherwise affected her salary, such as by qualifying her for lower raises than she would have been entitled to under pay band C. Though Cleary's raises following transfer were of a lower percentage of her salary than most of the raises she received while assigned to the Lobbying Office, Nationwide insists that this was because of a slight downgrade in performance ratings, from "superior" to "meets expectations," while handling new responsibilities under a new supervisor. Cleary does not purport that she was treated differently than other employees, and she offers nothing more than her own opinion that the decline in raises was a retaliatory gesture.

### 4. *Transfer to Lexington*

According to Nationwide, Cleary was transferred to Lexington, in autumn 1996, as a result of a reorganization of Gateway and Lexington that left Gateway with two technical secretaries and Lexington with none. After her request to hire a secretary for Lexington was denied due to a hiring freeze, Betts selected Cleary for transfer there over the other technical secretary, Sandra Gadson, because Gadson had been hired specifically for Gateway, and because Cleary's home was closer to Lexington than Gadson's home. Cleary offers no evidence that Nationwide's explanation is untrue. Moreover, while Cleary asserts that she was encumbered with an inordinate workload at Lexington, she bases this contention solely on her own opinion and fails to show that other employees were not similarly burdened.

### 5. *Denial of Additional Maternity Leave*

While Cleary contends that Nationwide "arbitrarily" denied her maternity benefits, *see* Appellant's Br., at 29, Nationwide contends that when Cleary took a nearly five-month leave, she "more than exhausted" her leave entitlement under company policies and the FMLA, *see* Appellee's Br., at 12. Though company policy allowed up to five months' leave in certain circumstances, Nationwide maintains that it required Cleary to return to work after just less than five months because her absence left the claims division short-handed. To show pretext, Cleary offers only evidence that an unidentified Nationwide official, in a hand-written note included in Cleary's employee file, determined that her position would not have to be held open if her leave exceeded twelve weeks. Since twelve weeks was the amount of time off Cleary was entitled to under the FMLA, and since Nationwide, in fact, allowed her a much longer leave, this evidence is insufficient to support Cleary's theory that she was denied additional maternity leave in retaliation for her harassment complaint.

### 6. *Constant Monitoring upon Return to Gateway*

Cleary insists that she was reassigned to Gateway following her maternity leave to punish her for reporting Herlong's harassment and to enable Betts to monitor her in an effort to gain evidence for this lawsuit. According to Nationwide, however, Cleary was brought back

to Gateway so that Betts could supervise her directly, because Betts had received complaints about Cleary from people she interacted with at Lexington, including comments that she was inefficient, made too many personal phone calls, and had a negative attitude.

To show that this reason was a pretext for retaliation, Cleary relies on evidence that she received good evaluations and complimentary cards and e-mail messages from Betts and other Nationwide employees and customers while assigned to Lexington. Cleary does not, however, point to any evidence calling into question Betts's testimony that she reassigned Cleary to Gateway to "confirm or refute the claims that were made against her and also to help her be more efficient in her work[,]" J.A. 175, that she discussed the complaints directly with Cleary rather than including them in her evaluation, and that she was satisfied that Cleary's performance had improved upon return to Gateway.

Although Nationwide denies that Cleary was monitored to gain evidence in defense of this lawsuit, the company contends that any monitoring by Betts of Cleary would have been justified because of Betts's position as Cleary's supervisor. Even assuming that Betts did monitor Cleary, Cleary does not point to any evidence that such monitoring was extraordinary.

### 7. *Denial of Transfer to Lexington*

Finally, Cleary asserts that Nationwide failed to post an opening at Lexington, and refused her request to fill the vacancy once she learned of it anyway, as a retaliatory measure. To bolster her contention, Cleary relies on evidence that Betts consulted Blakewood about this request, and that Blakewood was heavily involved in the Herlong harassment investigation. Nationwide contends that Betts declined to transfer Cleary back to Lexington because of her previous complaints about the workload there and because of a perceived improvement in Cleary's performance following her reassignment to Gateway. Betts consulted Blakewood about this decision "in an effort to ensure that all procedures were properly followed[.]" Appellee's Br., at 13 (citation omitted).

Though Nationwide does not explain why the position was not advertised in accordance with company policy, Cleary offers no evi-

dence to support her theory that this was aimed at depriving her of the position, or to explain why she would have been entitled to the job if the posting policy had been followed. Further, Cleary relies on the mere fact that Betts consulted Blakewood about Cleary's transfer request as proof of discrimination, without offering evidence that Betts was not merely pursuing the normal course for ensuring adherence to the law and company policy.

## IV.

In summary, even assuming that Cleary sufficiently established all of the elements of her prima facie case, *see* Part III.A, Nationwide proffered legitimate, non-discriminatory reasons for its actions. Cleary has failed to point to any evidence that Nationwide's explanations for these actions — except for its reason for closing the Lobbying Office — are false. Yet even if, as Cleary contends with support from the record, Nationwide shut down the Lobbying Office to cover up Herlong's behavior, no rational factfinder could conclude that this decision was motivated by an intent to discriminate against Cleary for reporting his harassment to the company. Therefore, we agree with the district court that Nationwide is entitled to summary judgment on Cleary's retaliation claim.

*AFFIRMED*