**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JANET D. VAUGHAN,
Plaintiff-Appellant,

v.

THE METRAHEALTH COMPANIES,
INCORPORATED,

No. 96-2214

Defendant-Appellee,

and

METROPOLITAN LIFE INSURANCE
COMPANY, INCORPORATED,
Defendant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Robert E. Payne, District Judge.
(CA-96-6-3)

Argued: April 8, 1998

Decided: May 29, 1998

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge,
and CHAMBERS, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Judge Chambers joined.

_____

**COUNSEL**

**ARGUED:** Stephen Jon Springer, LABRUM & DOAK, Philadelphia,
Pennsylvania, for Appellant. Laura Graham Fox, WRIGHT, ROBIN-

SON, OSTHIMER & TATUM, P.C., Richmond, Virginia, for Appellee. **ON BRIEF:** Jeffrey D. Hutton, Joseph L. Turchi, Kellie Ann Allen, LABRUM & DOAK, Philadelphia, Pennsylvania; John A. Gibney, Jr., SHUFORD, RUBIN & GIBNEY, Richmond, Virginia, for Appellant. Edward F. Rockwell, WRIGHT, ROBINSON, OSTHIMER & TATUM, P.C., Richmond, Virginia, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Janet Vaughan brought suit against her former employer under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34, alleging that age discrimination motivated her termination during the course of a corporate downsizing. The district court found that Vaughan had not adduced sufficient evidence that age discrimination was her employer's real motive for terminating her to survive the employer's motion for summary judgment. We agree. Even where an employer's explanation for taking action is disputed or disproved, a discrimination plaintiff must come forward with sufficient evidence that she was the victim of illegal discrimination before her case can go to the jury. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

I.

Vaughan was an employee of Metropolitan Life Insurance Co., Inc. ("MetLife") from 1986 until MetLife formed a joint venture with the Travelers Group, Inc. in January 1995. At that time Vaughan became an employee of the MetraHealth Companies, Inc., the entity that resulted from the joint venture. Forming MetraHealth necessitated some reorganization of MetLife's operations, a reorganization which was designed to regain a share of the health insurance market. Principally, MetraHealth defined new geographic "Hub Markets," with the consequence that the former MetLife regional office in Richmond, Virginia became a satellite office of MetraHealth's Baltimore/Washington, D.C./Northern Virginia Hub Market (the "DC Hub"). In light of this changed status, MetraHealth found it necessary

2

to eliminate some positions in the Richmond office. Paul Cooper, Vice President of Operations for MetraHealth's DC Hub, oversaw this process.

Cooper concluded that one employee could manage provider relations in the Virginia portion of the DC Hub. Before the formation of MetraHealth, two employees in MetLife's Richmond office had performed a comparable function as Regional Network Directors -- Harriet Meetz, responsible for network development in the southern portion of MetLife's Mid-Atlantic Region, and Vaughan, responsible for the northern portion. In choosing between Meetz and Vaughan to fill the new position of Director of Provider Relations, Cooper interviewed both women. His interview with Vaughan lasted thirty to forty-five minutes and took place on a day in which Cooper interviewed approximately fourteen other employees in the Richmond office. Cooper interviewed Meetz twice, first meeting with her for approximately three hours at MetraHealth's Northern Virginia office before Cooper even came to Richmond. Ultimately, Cooper named Meetz Director of Provider Relations and, on April 17, 1995, advised Vaughan that her position was being eliminated effective May 1, 1995. At this time, Cooper was fifty years old, Meetz was forty-five, and Vaughan was fifty-seven.

Vaughan filed suit against MetLife and MetraHealth, alleging that she was terminated because of her age in violation of the ADEA. MetLife was dismissed as a defendant,[1] and MetraHealth successfully moved for summary judgment. The district court found that Vaughan had not adduced evidence on the basis of which a reasonable juror could conclude that age discrimination more likely than not explained her termination. Vaughan now appeals.

II.

For the purposes of this appeal, we will assume, as the district court found, that Vaughan has made out a prima facie case of age discrimination. See O'Connor v. Consolidated Coin Caterers, 517 U.S. 308, 310-13 (1996) (outlining prima facie case). Therefore, under the

_____

[1] Vaughan does not challenge the dismissal of the case against MetLife on appeal.

3

three-stage proof scheme originally set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), "the burden of production shifts to the employer `to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" O'Connor, 517 U.S. at 311 (quoting McDonnell Douglas). Once MetraHealth meets its burden of production, Vaughan "must bear the burden of proving that [s]he was the victim of intentional discrimination. [Sh]e can do this by demonstrating that [MetraHealth's] proffered reason was a mere pretext and that, as between [her] age and[MetraHealth's] explanation, age was the more likely reason for the dismissal." Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir. 1988) (citing E.E.O.C. v. Western Electric Co., 713 F.2d 1011, 1014 (4th Cir. 1983)); see also Halperin v. Abacus Technology Corp., 128 F.3d 191, 201 (4th Cir. 1997).

A.

Throughout this lawsuit, MetraHealth has sought to justify Vaughan's dismissal as a result of its elaborate Downsizing Policy, which is memorialized in a 144-page Downsizing Manual. Cooper says he was guided in applying the Policy by MetraHealth human resources personnel, whose business it was to be familiar with the Manual. This was the explanation offered in MetraHealth's answers to Vaughan's interrogatories, the theme developed in MetraHealth's motion for summary judgment, the focus of Vaughan's argument, and the justification considered by the district court. This explanation satisfies MetraHealth's burden of production. Thus, in the final phase of the McDonnell Douglas test, we evaluate whether this justification was a pretext for age discrimination.

Vaughan disputes MetraHealth's explanation by pointing out that Cooper, who made the decision to discharge her, admitted he was not familiar with the Downsizing Manual, had never read it, and had in fact not seen it until his deposition in this lawsuit. Further, Vaughan identifies numerous departures from the Downsizing Policy. For example, the Manual calls for "objective v. subjective evaluation" and reliance on "facts v. opinions." But Cooper defended his choice of Meetz over Vaughan by asserting that "[m]anagement is a highly subjective art." MetraHealth developed Downsizing Analysis Forms DA-I and DA-II to implement the Downsizing Policy and to focus atten-

4

tion on employees' qualifications, specific experience, and abilities and strengths. Though Cooper did complete these forms, he did so with "no first-hand knowledge of the past performance levels of either Harriet Meetz or [Janet Vaughan]" and without reviewing either candidate's personnel file. Finally, the Downsizing Manual calls for an objective assessment of the number of years experience an employee has in the position in question, in a similar position, or in a comparable position in another division of the company. Yet Cooper admitted that he "make[s] judgments about people's abilities sometimes based on rather thin samples of their behavior" and that, when he terminated Vaughan, he was unaware of the extent of her experience with MetLife and did not know that she helped develop MetLife's Health Maintenance Organization ("HMO") network in Boston in the 1980s.

The district court noted these various differences between the Downsizing Manual and Cooper's actual decision-making process. It found the fact that MetraHealth often failed to follow its own Downsizing Manual to be "considerable evidence" that this explanation was pretext. While MetraHealth continues to insist that it has substantially complied with the Downsizing Manual, we agree with the district court that Vaughan has raised a genuine dispute over the credibility of the employer's proffered justification.

B.

Vaughan contends that she has thereby forestalled summary judgment for MetraHealth, urging us to rule that she may reach a jury by doing no more than calling MetraHealth's proffered justification into question. See, e.g., Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 355 (7th Cir. 1996) ("A plaintiff in an age discrimination case may defeat a summary judgment motion brought by the employer if the plaintiff produces evidence that the employer proffered a phony reason for firing the employee."). As have the courts of appeals who use this "pretext only" analytical model, Vaughan builds her argument on a single passage from the Supreme Court's opinion in St. Mary's:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.

5

Thus, rejection of the defendant's proffered reasons will <u>permit</u> the trier of fact to infer the ultimate fact of intentional discrimination, and the Court of Appeals was correct when it noted that, upon such rejection, "[n]o additional proof of discrimination is <u>required</u>."

509 U.S. at 511 (citation and footnote omitted).

Vaughan seeks to extrapolate from this passage a rule that all discrimination plaintiffs are summary judgment-proof as soon as they raise a jury question about the veracity of their employer's explanation for the challenged employment action. Undoubtedly, the quoted passage suggests that some plaintiffs may reach the jury solely on the basis of "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . together with the elements of the prima facie case." This is unremarkable, as a prima facie case of age discrimination often requires "some other evidence that the employer did not treat age neutrally," <u>Western Elec.</u>, 713 F.2d at 1015, such as discriminatory comments or marked favoritism towards younger, less qualified workers. Depending on the character of the evidence in each case, a discrimination claim <u>may</u> survive summary judgment solely on the strength of the prima facie case and the evidence that contradicts the employer's proffered justification -- if that evidence provides a factual basis for the ultimate finding of discrimination. Nevertheless, like the First Circuit Court of Appeals, "we do not think that the Supreme Court meant to say that such a finding [of discrimination] would <u>always</u> be permissible" once pretext is found. <u>Woods v. Friction Materials, Inc.</u>, 30 F.3d 255, 260-61 n.3 (1st Cir. 1994). Such an interpretation of <u>St. Mary's</u> reads far too much into a few lines of the opinion and, more importantly, cuts the heart out of the ruling.

The actual holding of <u>St. Mary's</u> was that a discrimination plaintiff using the <u>McDonnell Douglas</u> framework was <u>not</u> entitled to judgment as a matter of law simply because he made out a prima facie case and the trier of fact rejected his employer's proffered justification for firing him. In so holding the Court emphasized that the final stage of the <u>McDonnell Douglas</u> proof scheme requires the plaintiff to prove that the employer's proffered explanation is "a pretext <u>for</u> discrimination</u>." <u>St. Mary's</u>, 509 U.S. at 515 (quoting <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)); <u>see also</u>

6

Bodenheimer v. PPG Industries, Inc., 5 F.3d 955, 958 (5th Cir. 1993) (post-St. Mary's affirmance of summary judgment for employer because plaintiff did not "produce sufficient evidence to establish that [employer's] reasons were pretexts for age discrimination"). The Court explained that "a reason cannot be proved to be `a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's, 509 U.S. at 515 (quoting Burdine).

St. Mary's thus teaches that to survive a motion for summary judgment under the McDonnell Douglas paradigm the plaintiff must do more than merely raise a jury question about the veracity of the employer's proffered justification. The plaintiff must have developed some evidence on which a juror could reasonably base a finding that discrimination motivated the challenged employment action. See Theard v. Glaxo, 47 F.3d 676, 680 (4th Cir. 1995) ("Since the evidence was not sufficient for a reasonable jury to have concluded that Glaxo's decision not to promote Theard was wrongfully based on race, entry of summary judgment [for the employer] was justified."). As this court held in Halperin, an employer is entitled to summary judgment unless the ADEA plaintiff has adduced sufficient evidence "both that the reason was false, and that [age] discrimination was the real reason." 128 F.3d at 201 (quoting St. Mary's, 509 U.S. at 515) (alteration in Halperin); see also Jiminez v. Mary Washington College, 57 F.3d 369, 378 (4th Cir. 1995); Mitchell v. Data General Corp., 12 F.3d 1310, 1317 (4th Cir. 1993).

This approach, dubbed "pretext-plus,"[2] is a better approach than "pretext only." Pretext-plus best preserves the character of statutes like the ADEA as antidiscrimination statutes. To paraphrase St. Mary's, the ADEA "does not award damages against employers who cannot prove a nondiscriminatory reason for adverse employment action, but only against employers who are proven to have taken adverse employment action by reason of (in the context of the present case) [age]." 509 U.S. at 523-24. Of course, the simple fact "[t]hat the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered rea-

_____

[2] E.g., St. Mary's, 509 U.S. at 535-36 (Souter, J., dissenting) (characterizing majority's approach as "pretext-plus").

7

son of [age] is correct." Id. at 524. Like the Supreme Court, we recognize that "nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable." Id. at 514-15. By allowing all ADEA plaintiffs to reach a jury on bare evidence of pretext, with scant record support for the ultimate claim of age discrimination, the "pretext only" rule for which Vaughan contends would permit the intricacies of a judicially-devised proof scheme to replace a plaintiff's congressionally-mandated burden.

C.

Thus Vaughan can survive summary judgment only if she has developed some evidence both that MetraHealth's purported reliance on the Downsizing Manual was false, and that discrimination was the real reason for her discharge. Id. at 515; accord Woroski v. Nashua Corp., 31 F.3d 105, 108-09 (2d Cir. 1994); Woods, 30 F.3d at 260. But none of the evidence Vaughan offers supports her claim of age discrimination.

Though Vaughan appears to assert that she was better qualified than Meetz, at best her "evidence would only support a finding that she was qualified for the . . . job, not that she was more qualified than [Meetz]," Durham v. Xerox Corp., 18 F.3d 836, 840 (10th Cir. 1994) (emphasis added), which she must demonstrate to prove age discrimination. See Evans v. Technologies Applications & Servs. Co., 80 F.3d 954, 960 (4th Cir. 1996) (describing similar burden in sex discrimination case). Standing alone, self-serving claims of superiority do not suffice. Bodenheimer, 5 F.3d at 959. Vaughan makes no claim that Meetz was unqualified to be Director of Provider Relations. Even taken in the light most favorable to Vaughan, the evidence in the case reveals only what Vaughan herself says, that she and Meetz "had comparable qualifications."

Moreover, there is considerable undisputed evidence that Meetz was truly the superior candidate. On the Downsizing Analysis Forms Cooper completed, Meetz scored higher than Vaughan in the categories of qualifications, specific experience, and abilities and strengths. Cooper justified his preference of Meetz in part based on her recent

8

six years experience running a profitable, staff-model HMO for a company that MetraHealth considered a "market leader" and with which MetraHealth hoped to compete. At the time of the downsizing, MetraHealth was planning to move towards the staff-model organizational framework, wherein health care providers would become employees of MetraHealth directly rather than just contracting with MetraHealth. Thus Meetz's HMO experience was directly relevant to MetraHealth's anticipated needs; it made her ideally suited to facilitate MetraHealth's transition to staff-model relations with its providers. Vaughan argues that Cooper ignored her HMO experience from the 1980s, but she does not explain how this experience gave her skills that were superior -- or even comparable-- to Meetz's. Furthermore, Cooper valued Meetz's clinical training as a dentist. Vaughan had no similar training. Though clinical training was not formally a requirement for the job of Director of Provider Relations, Cooper was certainly entitled to take Meetz's special abilities into account in choosing which employee would best interact with the health care providers in MetraHealth's network. Thus, Cooper has identified two aspects of Meetz's qualifications that set her apart from Vaughan; he has explained how those qualifications played into his decision; and Vaughan has failed either to dispute that Meetz had those qualifications or to create any doubt that Cooper actually took them, and not the candidates' ages, into account in selecting Meetz as Director of Provider Relations.

As noted above, Vaughan did identify several obvious departures from MetraHealth's Downsizing Manual. While MetraHealth's failure to follow its own Manual certainly makes the attempt to use the Manual to justify discharging Vaughan pretextual, it does not even hint that the real motive was age discrimination."The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." Randle v. City of Aurora, 69 F.3d 441, 454 (10th Cir. 1995). Federal courts cannot ensure that business decisions are always informed or even methodical. As the Fifth Circuit explained:

> Proof that an employer did not follow correct or standard procedures in the termination or demotion of an employee may well serve as a basis for a wrongful discharge action under state law. As we have stated, however, the ADEA was

9

not created to redress wrongful discharge simply because the terminated worker was over the age of forty. A discharge may well be unfair or even unlawful yet not be evidence of age bias under the ADEA.

Moore v. Eli Lilly & Co., 990 F.2d 812, 819 (5th Cir. 1993) (footnote omitted). In fact, MetraHealth might have satisfied its burden of production in a non-pretextual manner. If the company had not proffered the Downsizing Manual as the justification for its actions, but had rested on the respective qualifications of the two applicants, we would have little occasion even to discuss its internal procedures.

Vaughan next says that age discrimination is evident because six of the seven people discharged from the Richmond office were over age forty and thus age-protected under the ADEA. We have repeatedly noted that statistical evidence is inherently malleable and that it is thus subject to careful scrutiny. Western Elec., 713 F.2d at 1018 (citing cases). Vaughan's "statistics" are particularly unhelpful, as they are drawn from a sample of seven employees, which is too small for reliable analysis. Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511 (4th Cir. 1994) (indicating that samples of between five and thirteen are too small to have any predictive value). And though we have recognized that statistical evidence generally needs to be supported with expert testimony, Vaughan has proffered none to bolster her shaky numerical data. See Carter v. Ball, 33 F.3d 450, 456 (4th Cir. 1994). Moreover, the data include downsizing decisions with which Cooper, the alleged discriminator in this case, was not directly involved. Thus, for several reasons Vaughan's numerical evidence falls short of indicating that age discrimination motivated her discharge.

As more evidence that age animus played a role in Cooper's downsizing decisions, Vaughan points to Cooper's choice of thirty-two-year-old Maryanne Randazzo over forty-two-year-old Robert Balash as "sales team leader" for the DC Hub. In a proper case, a decision maker's repeated favoritism of younger workers over older ones might be relevant to age animus. See Herold, 864 F.2d at 320. Vaughan's "evidence," however, consists of nothing more than the bare assertion that the younger worker replaced the older. And we have explained that:

10

> [i]n a reduction of work force case, the fact that the duties of a terminated older employee were assumed by a younger individual is not conclusive of age bias. The same rule applies to replacement cases as well, where the mere fact of replacement by a younger worker is not dispositive of age discrimination. If it were, it would transform the ADEA into something akin to a strict seniority protection system.

Birkbeck, 30 F.3d at 512 (citations omitted).

Vaughan also complains that MetraHealth did not transfer her to Philadelphia, while two other, younger workers were offered transfers to other offices. This "disparate treatment," she says, evidences age bias. We disagree. There was no job for Vaughan in Philadelphia without firing another, younger employee, a step towards reverse discrimination that the ADEA in no way requires. Pages-Cahue v. Iberia Lineas Aereas de Espana, 82 F.3d 533, 538 (1st Cir. 1996) (rejecting claim that employer should have dismissed younger worker to make a job for displaced older worker; collecting cases). Vaughan's situation was also markedly different from the plaintiff in Herold, where an employee made out a case of age discrimination in part because his employer had not offered him the job of a younger worker even though the older employee was contractually entitled "to `bump' workers with less seniority." 864 F.2d at 320. Vaughan possessed no such enforceable seniority right, so no inference of age discrimination arises from MetraHealth's unremarkable decision not to fire a younger worker in Philadelphia in order to free up a position for Vaughan.

Ultimately, Vaughan's argument boils down to a complaint that Cooper's process for choosing the Director of Provider Relations was too haphazard and subjective. "That appellation, however, does not convert an otherwise legitimate reason [for an employment decision] into an illegal one." Western Elec., 713 F.2d at 1016 (citing Burdine, 450 U.S. at 256-57); accord Holmes v. Bevilacqua , 794 F.2d 142, 147-48 (4th Cir. 1986). "[T]he presence of subjectivity in employee evaluations is itself not a grounds for challenging those evaluations as discriminatory." Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 780 (8th Cir. 1995). In fact, in filling an upper-level management post, some degree of subjectivity is inevitable, as the decision maker must balance employees' different strengths and qualifications, pre-

11

dicting all the while who will be the best ambassador for the company and most effectively serve its business needs. Judgments such as these are neither mechanical nor quantifiable. Their imprecision, however, need not signal an infection with age animus.

In sum, Vaughan must adduce some evidence that MetraHealth's proffered justification was not just a pretext, but a pretext for age discrimination. This she has not done. Because she cannot meet the burden that Congress by statute has assigned her, we cannot displace the employer's business decision. We therefore affirm the judgment of the district court.

AFFIRMED

12