**Samuel M. LANGERMAN**

v.

**Tommy G. THOMPSON,[1] Secretary, Department of Health and Human Services**

**Civil Action No. 99–3011.**

United States District Court, D. Maryland.

Aug. 17, 2001.

---

1. Tommy G. Thompson is substituted as defendant in place of the former Secretary of the United States Department of Health and Human Services, Donna E. Shalala. *See* Fed. R.Civ.P. 25(d)(1).

Samuel M. Langerman, Washington, DC, pro se.

Andrea Leahy–Fucheck, Office of the U.S. Attorney, Baltimore, MD, for defendant.

### MEMORANDUM OPINION

CHASANOW, District Judge.

Pending and ready for resolution in the employment discrimination action are Plaintiff and Defendant's cross motions for summary judgment. Plaintiff, Samuel M. Langerman, brings sex and race discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") against Defendant the National Institutes of Health ("NIH"). No hearing is deemed necessary, and the court now rules pursuant to Local Rule 105.6. For the following reasons, the court shall GRANT Defendant's motion and DENY Plaintiff's motion.

### I.  Background

The following facts are undisputed or presented in the light most favorable to Plaintiff Samuel M. Langerman. In 1992, Plaintiff, a white male, applied for the

position of supervisory equal employment specialist ("supervisory specialist") in NIH's Office of Equal Opportunity ("OEO"). The supervisory specialist serves as chief of OEO's Complaints Management and Adjudication Branch and is responsible for processing all aspects of an Equal Employment Opportunity ("EEO") discrimination complaint, which includes coordinating complaint hearings, investigations, writing and reviewing proposed dispositions, and performing supervisory responsibilities. At the time he applied for the position, Plaintiff, who holds a law degree, had managed an Equal Employment Opportunity ("EEO") complaints program for four years, had training as a supervisor and an EEO adjudicator, and was certified as an EEO investigator. From 1973 to 1976, he also supervised a staff of six, but not in an EEO office.

Diane Armstrong, the former director of OEO, and an African American female, began the process of soliciting for the supervisory specialist position by preparing and sending to an administrative officer a "recruitment action." Attached to the recruitment action was a five-page detailed description of the major duties of the position ("position description"). Otis Watts, former OEO deputy director and Armstrong's direct superior, prepared a crediting plan for the position. A crediting plan contains two components: (1) criteria for determining basic eligibility; and (2) job-related criteria used to rate qualifications to identify the best qualified candidates. A crediting plan is generally derived from a job analysis. A personnel specialist and "subject matter expert" must approve the job analysis and crediting plan before a particular vacancy can be announced. No written job analysis was prepared for the supervisory specialist position. Watts, as the subject matter expert, and NIH Personnel Management Specialist Wanda Faux developed and/or reviewed the cred-

iting plan. Faux explained that she used the same procedures to evaluate the crediting plan for the supervisory specialist position that she would have used had there been a written job analysis, which included reviewing the position description and other materials. She further stated that while NIH procedure requires a written job analysis, it was not unusual for one not to be done. Also, Armstrong, as the "selecting official" for the position should have reviewed the crediting plan before a job vacancy announcement was posted but failed to do so.

The crediting plan consisted of the following four "knowledge, skills or ability" ("KSA") categories that a Qualification Review Board ("QRB") used to rank and evaluate applicants: (1) ability to direct activities to implement a strong EEO complaints management and adjudication program; (2) ability to communicate orally and in writing; (3) knowledge and understanding of laws, regulations, and procedures governing EEO complaints processing and adjudication; and (4) ability to manage and motivate staff. Armstrong selected a five-member QRB, consisting of the following individuals: (1) Martha Pine, a white female; (2) Richard Sherbert, a white male; (3) Raymond Becich, a white male; (4) Kenneth Cooke, a black male; and (5) James Pike, a white male.

According to the Public Health Service ("PHS") Merit Promotion Program, at least three members of the QRB should be experts in, or have significant knowledge of, the discipline or occupational category of the position being filled. They must also be familiar with promotion program requirements. None of the members had ever served on a QRB dealing with a supervisory specialist position.

The QRB met on September 10, 1992 and rated and ranked the applicants.

Faux provided to the QRB members materials of the applicants who met the minimum qualifications for the position, a copy of the crediting plan, position description and vacancy announcement. She also served as technical advisor to the QRB and was present during this meeting. The QRB rated 22 applicants, and selected and listed 18 of the applicants on the Merit Promotion Certificate ("promotion certificate"). Plaintiff made the promotion certificate and was rated as highly qualified, earning a final score of 33, as did Linda Morris, the African American female who received the supervisory specialist position. Armstrong testified in the EEOC administrative proceeding that she gave the panel no instruction as to what type of person to recommend. Further, Faux stated that she heard no comments regarding race or gender during the QRB meeting. Despite NIH Merit Promotion Plan procedures requiring that completed ranking or rating forms be kept for two years, the QRB's individual rating worksheets were discarded. However, Faux compiled and maintained the final cumulative ratings for each candidate.

Generally, the QRB only reviews, ranks and rates applications, but Armstrong also asked the panel to interview the candidates they certified. She further asked another African American male, Dr. Leamon Lee, to join the QRB as part of the interview panel. Of the 18 applicants certified, the QRB interviewed 15 candidates, including Plaintiff and Morris. The QRB composed and asked each applicant four questions during the interviews, and selected five "top candidates" from among the pool. Armstrong was provided the entire certified list of 18, which included a note listing the top five candidates. Plaintiff failed to make the top five list, which consisted of all African American females. The QRB's interview notes were discarded.

After receiving the list, Armstrong considered only the top five candidates chosen by the interview panel for the position. The instructions on the face of the Certificate of Promotion request that the selecting official consider all candidates certified, and Faux testified during the administrative proceeding that Armstrong as the selecting official should have considered all the names on the promotion certificate. She also stated, however, that Armstrong's failure to do so was not "procedural error."

After consulting with Deputy Director Watts, Armstrong selected Morris, who at the time had served as an EEO specialist for 12 years, the last six of which were served in the department where the vacancy existed. She reported to the former supervisory specialist, Carlos Delgado, and for one month in early 1992, served as acting supervisory specialist or branch chief in his place. Armstrong stated that she selected Morris because of her NIH experience and interaction with management officials, and her accomplishments while working with the Complaints Management and Adjudication Branch.

## II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505;

*see also Pulliam Inv. Co., Inc. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R.Civ.P. 56(c); *Pulliam,* 810 F.2d at 1286 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 437 (4th Cir. 1998). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex,* the Supreme Court stated:

In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "spe-

cific facts showing that there is a genuine issue for trial."

*Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.,* 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.,* 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd,* 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### III. Analysis

■ Plaintiff presents no direct evidence of discrimination, and thus the court turns to the framework as outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to analyze his claims. Plaintiff may establish a prima facie case of discriminatory failure to hire or promote based on race and sex by showing that: (1) he is a member of a protected category; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Brown v. McLean,* 159 F.3d 898, 902 (4th Cir.1998) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Alvarado v. Board of Trustees of Montgomery Cmty. College,* 928 F.2d 118, 121 (4th Cir.1991)); *see also* 42 U.S.C. § 2000e–2(a)(1) (listing race and sex among the protected categories). In cases where the position sought was filled, the fourth prong is most easily satisfied by showing that someone outside of the plaintiff's protected group ultimately was selected for the position. *See e.g., Equal Employment Opportunity Commission v. Sears Roebuck and Co.,* 243 F.3d 846, 851 (4th Cir.2001) (showing made in

failure to hire case as defendant continued to seek applicants after rejecting Hispanic male plaintiff and then selected "less qualified" white female); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996) (failure to promote case in which female plaintiff showed position was filled by male, which raised an inference of sex discrimination).

■ Once a plaintiff establishes a prima facie case of discrimination, the defendant must advance a legitimate, nondiscriminatory reason for the employment decision at issue. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (citation omitted). The presumption of discrimination drops out once a defendant has advanced such a reason. *Id.* A plaintiff must then be allowed to show by a preponderance of the evidence that the reasons offered by the defendant were not its true reasons, but pretext for unlawful discrimination. *Id.; Monroe v. Burlington Indus., Inc.*, 784 F.2d 568, 571 (4th Cir.1986) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817; *Cuthbertson v. Biggers Bros., Inc.*, 702 F.2d 454, 458 (4th Cir.1983)).

■ Plaintiff establishes a prima facie case of race and sex-based discrimination. He is a white male. He applied for the supervisory specialist position and was qualified for it as the QRB rated him highly qualified and selected him to interview for the position. He was rejected and the employer selected Morris, a black female.

The burden then shifts to Defendant to advance a legitimate, non-discriminatory reason for selecting Morris as the supervisory specialist, which it does by stating that of the five finalists selected by the QRB interview panel, Armstrong found Morris to be the most qualified. *See Jefferies v. Harris County Cmty. Action Ass'n*, 693 F.2d 589, 590 (5th Cir.1982) ("[T]he promotion of a better qualified applicant is a legitimate and nondiscriminatory reason for preferring the successful applicant over the rejected employee who claims that the rejection was discriminatory.") (citing *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). QRB member Pike testified that the panel constructed four standard questions that they asked each of the 15 interviewees.[2] Paper no. 19, Defendant's exhibit 11 at 153. The panel reached a consensus that, based on their individual judgments, five candidates stood out from the rest. Plaintiff was not among the these five. Armstrong received the applications of all individuals on the promotion certificate, but only reviewed the five applications the board identified as the top five. Although instructions on the face of the promotion certificate request that selecting officials consider all the applications before making a decision, Faux, as personnel management specialist testified that Armstrong committed no error in restricting her consideration to the five top candidates. Plaintiff presents no evidence to contradict Faux's assertion. Armstrong testified that in reviewing the applications, she was looking for a candidate who had "in-depth experience" in complaints processing and who had experience interacting with management officials. Armstrong

---

**2.** The QRB interview panel asked each applicant the following four questions: (1) What is the most difficult professional problem you have faced, and how did you handle it; (2) Briefly describe several recent situations where you have had to remain neutral and negotiate a settlement; (3) Please discuss your concept of managing a service group and planning and operating a service operation; and (4) How do you view your role as a representative of management. Paper no. 19, Defendant's exhibit 1 at 7.

found Morris best suited for the position. Morris had gained EEO experience at both the NIH and the National Cancer Institute. She also had experience interacting with management officials and had been awarded twice for reducing the backlog of complaints and for settling complaints that had been problematic to the office. She also had training as an EEO investigator. Further, Morris had worked as an EEO specialist for 12 years, the last six of which were served in the office where the supervisory specialist position existed. In fact, she worked directly under the former supervisory specialist/branch chief, and once assumed his duties for a month during her tenure there.

■ Plaintiff argues that Defendant has failed to articulate a legitimate, non-discriminatory reason because the QRB's interview notes were destroyed and thus there is no way to prove based on the interview that Morris was the best candidate for the position.[3] Although the QRB members could not recall the specific responses of each interviewee, they nevertheless have articulated a legitimate, non-discriminatory reason for selecting the top five candidates for the supervisory specialist position. As the Court stated in *Burdine*, a "defendant need not persuade the court that it was actually motivated by the proffered reasons ... the defendant [needs only] clearly set forth ... the reasons for the plaintiff's rejection." 450 U.S. at 254–55, 101 S.Ct. 1089; *see also Obi v. Anne Arundel County*, 142 F.Supp.2d 655, 660 (D.Md.2001) (defendant must "merely articulate some legitimate reason for its action") (citing *E.E.O.C. v. Clay, Printing Co.*, 955 F.2d 936, 941 (4th Cir.1992) (quoting *E.E.O.C v. Western Electric Co. Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983))). De-

fendant meets this burden as the record shows that after each interview, the QRB panelists arrived at a consensus as to which five candidates provided the best responses to the questions. Paper no. 19, Defendant's exhibit 8 (Pike affidavit) ("We [the QRB interview panel] determined that there were five true highly qualified candidates and they were referred to the selecting official ...."); *id.* exhibit 9 (Sherbert affidavit) ("there was a consensus on the top five that we referred"). This is sufficient evidence that the QRB selected those it deemed to be the top five candidates in a nondiscriminatory fashion.

### A. The Selection Process

Plaintiff argues that assuming Defendant does present a non-discriminatory reason for not selecting him, it is pretext for discrimination. To show pretext, Plaintiff essentially attacks the selection process at several stages: (1) from the creation of the crediting plan through the selection of the QRB; (2) the interview process; and (3) Armstrong's selection of Morris. The court addresses each argument in turn.

### 1. *Crediting Plan and QRB members*

■ Plaintiff argues that the crediting plan employed by the QRB was poorly designed and prohibited its members from being able to make meaningful distinctions among applicants. He argues that a combination of a "faulty" crediting plan and unqualified evaluators placed five black females lacking his experience on par with him.

With respect to the crediting plan, Plaintiff contends that under the first KSA, the crediting plan listed experience managing an EEO counseling program as "highly

---

**3.** The court will discuss later in more detail Plaintiff's arguments regarding Defendant's

destruction of certain documentation related to the interview process.

satisfactory experience," but did not list the broader experience of "managing a total complaints program", i.e., handling the pre-complaint processing phase and the formal processing and adjudication phases. Thus, QRB members gave no credit for Plaintiff's experience in that area. The crediting plan also listed as highly satisfactory experience "collecting, analyzing and organizing data that support procedural or policy changes which address affirmative employment planning and implementation." Plaintiff appears to argue that based on the position description, this criterion is not related to the position and should not have been included on the crediting plan.

■ Plaintiff also points out that Defendant did not create a written job analysis for the supervisory specialist position and Armstrong, as the selecting official should have, but did not, review the crediting plan before a job vacancy announcement was posted. However, Faux testified that she used the same procedures to evaluate the crediting plan that she would have used had there been a written job analysis, which included reviewing the position description and related documentation. In addition, Eduardo Ribas, the current director of the Human Resource Program Support Division, Office of Human Resource Management, NIH, who is in charge of policy oversight of the NIH Merit Promotion Program, provided an affidavit stating that although the promotion program requires a job analysis be documented, that requirement is satisfied if there exists a copy of the position description and the position description cover sheet, which there was in this case. Also, while Armstrong did not review the crediting plan before the vacancy was announced, Watts, Armstrong's direct superior, apparently did as he drafted the plan.

With respect to the qualifications of the QRB members, the PHS Merit Promotion Program requires that a QRB be "composed of at least three members who are expert in or have significant knowledge of, the discipline or occupation category of the position being filled." In addition, QRB members must be familiar with promotion plan requirements. Plaintiff argues that the five members who served on the QRB for the position he applied for were not qualified because none of them had ever served on a QRB dealing with an EEO complaints manager. Plaintiff also makes much of the fact that some QRB members could not remember who asked them to serve on the QRB for the supervisory specialist position, Faux or Armstrong. According to the PHS Merit Promotion Program, a servicing personnel officer should select members of the QRB. However, Armstrong chose the QRB.

■ Nevertheless, even assuming that the QRB members lacked the knowledge Plaintiff claims they should have had about the supervisory specialist position or the promotion plan, and that there existed deficiencies in the crediting plan, does not automatically lead to the conclusion that Defendants unlawfully discriminated against Plaintiff. In a disparate treatment case such as this, Plaintiff must show that he was treated less favorably than other applicants because of his race or sex. *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). To the extent any deficiencies in the selection process existed, they affected all candidates equally. There is absolutely no evidence that the selection process was designed to, or in fact did, discriminate against white men in general or Plaintiff in particular because he is a white male. *See Obi*, 142 F.Supp.2d at 664 (plaintiff's argument that the selection process did not allow his

qualifications to receive full consideration failed as, *inter alia*, he offered no evidence that defendant's selection process operated against him invidiously because of his race or national origin). Likewise, assuming NIH failed precisely to follow its own procedures with respect to devising the crediting plan or selecting QRB members does not implicate Title VII unless Plaintiff shows that Defendant's failure to do so was the result of unlawful discrimination. *Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 203 (4th Cir.1998) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent.") (citing *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir.1995)); *Obi*, 142 F.Supp.2d at 668 (citing *Vaughan* for this proposition). Plaintiff fails to show that the crediting plan or the alleged unqualified QRB acted unlawfully to discriminate against him as he presents no evidence that he was treated or his skills were assessed any differently than other applicants.

More importantly, it is difficult to discern, based on the record, how Plaintiff was discriminated against or injured at all by the alleged deficiencies in the crediting plan or unqualified QRB members. As Plaintiff admits, the QRB used the crediting plan to rate and rank him and found him highly qualified for the supervisory specialist position. His name was placed on the promotion certificate and he was interviewed along with 14 other candidates. While Plaintiff argues that other candidates lacked his experience of managing a total complaints program, he does not argue or present evidence that they were unqualified for the position.

### 2. *Interview Process*

■ Plaintiff also claims there were errors with respect to the interview pro-

cess. He claims that the QRB interview panel failed to employ clearly defined uniform standards or criteria in determining which candidates to recommend to Armstrong. However, it is uncontradicted that the interview panel devised a standard set of four questions to ask each candidate during the interviews, and that after each interview, the panelists discussed their impressions of each candidate. They then held a general discussion concerning all candidates after the interviews were complete and selected the five top candidates accordingly. Paper no. 16, Plaintiff's exhibit C3 at 218–19. Plaintiff opines that without clearly defined uniform standards to apply to each applicant, it is unlikely that a final group consisting of five black females was accidentally selected. Plaintiff points out that QRB member Becich stated that he believed both Langerman and Morris were equally qualified, and that it came down to a "judgment call" as to with whom Armstrong could work better. Plaintiff suggests that this reference to a "judgment call" means that the panel felt Armstrong could work better with a black female. However, to draw such a conclusion based Becich's statement would be nothing more than speculation and conjecture. "As courts are not free to second-guess an employer's business judgment, a plaintiff's mere speculations are insufficient to create a genuine issue of fact regarding [an employer's] articulated reasons for [its decisions] and avoid summary judgment." *Brown v. Brody*, 199 F.3d 446, 458–59 (D.C.Cir.1999) (internal quotation marks omitted) (citing *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988)).

In fact, Becich stated that the panel did not take sex or race into account in making its decision. Paper no. 16, Plaintiff's exhibit A7. Pike also testified during the EEOC proceeding that Armstrong did not

instruct the panel to select any particular type of person. Paper no. 19, Defendant's exhibit 11 at 157. Cooke stated that the QRB did not discuss race at all, but merely tried to determine who in their judgment would be the best person for the job. Paper no. 16, Plaintiff's exhibit C4 at 9–10 ("the five finalists represented the cream of the crop"); *see also id.* Plaintiff's exhibit C5 at 32 (Sherbert's administrative hearing transcript) (we asked the four questions and the follow up questions, and based on candidates' responses, chose who we believed to be the best person for the job). Other than bald assertions about not being selected because of his race and sex, Plaintiff presents no evidence that any candidate's race or gender played a role in the interview process.

■ To be sure, the interview process involved subjectivity, as it largely consisted of choosing candidates based on the QRB's perception of how well they answered questions.[4] However, the fact that the QRB's interview process was "subjective" or even "haphazard" does not mean it was unlawfully discriminatory. *Vaughan,* 145 F.3d at 204. "[I]n filling an upper-level management post, some degree of subjectivity is inevitable, as the decision maker must balance employees' different strengths and qualifications, predicting all the while who will be the best ambassador for the company and most effectively serve its business needs." *Id.* Moreover, an employer is free to create its own standards for selecting candidates for a position as long as such standards are not a mask for discrimination. *See e.g., Beall v. Abbott Laboratories,* 130 F.3d 614, 619–20 (4th

Cir.1997) (citing *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1571 (7th Cir.1989)).

The Fourth Circuit has advised that if individuals, who are not members of a plaintiff's protected category under Title VII, employ any degree of subjectivity in the process of comparing and evaluating the plaintiff's credentials with other candidates, "the legitimacy and nondiscriminatory basis of the articulated reason for the [employment] decision [at issue] may be subject to particularly close scrutiny . . . ." *Page v. Bolger,* 645 F.2d 227, 230 (4th Cir.1981). In this case, however, the six-member interview panel consisted of five men and four whites. As Defendant points out, it is difficult to imagine based on the record that this panel would conspire to keep a white male off the list of top five candidates solely because he is a white male.

While Plaintiff is undoubtedly upset that he did not make the top five list, he must bear in mind that Title VII is only designed to remedy discrimination based on one's sex, race or other protected category. 42 U.S.C. § 2000e–2(a). The statute is not meant to remedy every procedural flaw that exists in an employer's selection process. Moreover, courts do not sit as " 'super personnel departments' determining, without regard to [a defendant's] ability to assess the full dimension of its employees' qualifications . . . whether its perception of an employee's qualifications is erroneous." *Mackey v. Shalala,* 43 F.Supp.2d 559, 567 (D.Md.1999) (citing *Evans v. Technologies Applications & Services Co.,* 875 F.Supp. 1115, 1120 (D.Md.1995), *aff'd by published opinion,* 80 F.3d 954 (1996)). Plaintiff fails to show that in selecting the top five

---

**4.** Plaintiff points out that two panelists stated that the QRB did not rest solely on the interviewees' responses to the interview questions in selecting the top five candidates. Pine stated that in addition to the four questions, panelists also considered the KSAs that had been developed for the position. Paper no. 16, Plaintiff's exhibit C7 at 85. Dr. Lee stated that in addition to the questions, the panelists also considered the candidates' application materials. *Id.* exhibit C6 at 65.

candidates, the panelists considered any unlawful criteria, or that their reason for selecting the finalists, i.e., their interview performances, served as a mask to discriminate against him.

### 3. *Armstrong's selection of Morris*

■ As already explained, Armstrong did not consider Plaintiff's application or the application of any other candidates who were not among the top five selected by the QRB. Although the promotion certificate requested that Armstrong consider all applications before making a decision on the vacancy, *see* Paper no. 16, Plaintiff's exhibit A4 ("Please consider each candidate before making a selection for your vacancy"), Faux, NIH personnel management specialist, testified, and Plaintiff presents no evidence to the contrary, that Armstrong's failure to do so was not procedural error.

■ Plaintiff's main contention with respect to Morris is that he is better qualified because he has a law degree, supervisory experience, and experience managing a total complaints program. However, a law degree was not listed as a requirement for the position and Plaintiff fails to explain how it is relevant other than a conclusory statement in his opposition memorandum that "[s]urely, a candidate with a law degree … brings a little something extra to a position that requires interpreting and applying EEO laws …." Also, while Plaintiff supervised a staff from 1973 to 1976, he admits that he never supervised an EEO office. In contrast, prior to being selected for the position, Morris already had performed the supervisory specialist position for one month and Armstrong was familiar and pleased with her work. A defendant is free to choose among equally qualified individuals for a position as long as the selection is not based on illegal criteria. *Mackey*, 43

F.Supp.2d at 566 (citation omitted) Further, "it is the perception of the decision maker and not the self-assessment of the Plaintiff that is relevant." *Id.* (citing *Beall*, 130 F.3d at 620). Armstrong considered Morris the best qualified of the candidates she considered for the position, and selected her for that reason. Nothing in the record suggests otherwise. Thus, Plaintiff fails to show that Armstrong's reason for selecting Morris was pretext for discrimination.

### B. Destruction of documents

■ Plaintiff also argues that he is disadvantaged because several documents used to assess the candidates during the selection process were destroyed. He primarily focuses on the individual rating sheets the QRB filled out during their initial meeting and notes taken during the interviews.

Plaintiff claims that without the individual rating sheets, he cannot show that one or more of the black females should not have made the promotion certificate. However, it is uncertain exactly what information Plaintiff would derive from the individual rating sheets that he cannot glean from the cumulative QRB evaluation scores, which shows the combined score each applicant received after compiling the scores from their individual rating sheets. After QRB members rated an applicant, Faux totaled the scores for that applicant and transferred that number to a separate sheet. Paper no. 19, Defendant's exhibit 5 at 115–117. Further, she reviewed the individual candidate's score with each QRB member before she transferred the score. She stated that she followed this procedure to eliminate errors during the transfer. Since the cumulative scores are available, and there is no evidence that Faux committed errors in transferring scores, it

is unclear exactly why Plaintiff requires the individual rating sheets.

Also, there is no indication, as Plaintiff appears to suggest, that the individual rating sheets were destroyed as a cover up for discrimination. He points out that PHS merit program procedures require that rating forms be kept as merit promotion documentation for two years. However, Faux stated, and there is no evidence to the contrary, that it was routine practice to keep only the cumulative scores of applicants and to discard the individual rating sheets. Further, she testified that she discarded the rating sheets before she knew Plaintiff had filed a discrimination complaint. In addition, Ribas, who is responsible for policy oversight of the NIH Merit Promotion Program, stated that his "method of documenting the rating scores for each candidate would be to file the cumulative rating sheets for the entire promotion case and ... not to maintain the individual candidate rating sheets." *Id.* exhibit 7 ¶ 8.

Plaintiff also argues that because the QRB interview panelists destroyed their interview notes, he cannot show he performed better in his interview than other applicants. However, Plaintiff's argument is based on the notion that panelists' notes contained detailed accounts of the interviews or some systematic, numerical rating of each interviewee. There is no evidence that this is so. The record is devoid of any specifics as to what the panelists wrote down or evidence that their notes would be helpful in detailing the specific reasons the panel selected the top five finalists.[5] In sum, Plaintiff has failed to show that De-

fendant's proffered reason for his non-selection was pretext for discrimination.

## IV. Conclusion

For the foregoing reasons, the court shall GRANT Defendant's motion for summary judgment and DENY Plaintiff's motion.

---

5. In fact, during the administrative proceeding, Plaintiff asked one QRB member, Dr. Lee, whether he remembered anything about "the people who just missed making the final list." Paper no. 16, Plaintiff's exhibit C6 at

62. After Dr. Lee responded that he did not, Plaintiff asked him would his "notes have reflected this sort of information," to which he responded, not that he recalls. *Id.*